RAINBOW GASOLINE CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 65152, 72365. Promulgated January 15, 1935.

*Harold E. Rorschach, Esq.*, and *Jack L. Rorschach, Esq.*, for the petitioner.

*Willis R. Lansford, Esq.*, for the respondent.

OPINION.

TRAMMELL: These are consolidated proceedings for the redetermination of income taxes for the years 1929 and 1930 in the amounts of $1,179.22 and $6,162.93, respectively. The issues are: (1) Whether limitations barred assessment and collection of the deficiencies at the dates of mailing of the deficiency notices; (2) whether petitioner is entitled to deductions for depletion of casinghead gas; (3) whether petitioner is entitled to compute deductions for depreciation on the unit of production basis; (4) whether certain expenditures in the taxable year constituted capital investments or deductible expenses; and (5) whether petitioner is entitled to certain deductions for accrued interest. Respondent asserts claim to an increase in the deficiency for 1930 on account of a deduction for interest alleged to have been improperly allowed for said year.

*Issue (1)—Limitations.*—In the original petitions it is alleged as the first assignment of error that assessment and collection of the deficiencies were barred by limitations at the time of the mailing of the deficiency notices. In its brief petitioner does not discuss this issue, and if not to be considered as abandoned, we find no merit in the allegations.

*Issue (2)—Depletion.*—Petitioner contends that it is entitled to deductions for depletion on casinghead gas. In its original returns for 1928 and 1929 petitioner did not claim any deduction on account of depletion, but in its original return for 1930 and in an amended return for 1929 it deducted such amounts, which were disallowed by the respondent on the ground that petitioner was engaged in the business of manufacturing natural gasoline and did not own the property from which the gas was produced.

The evidence in the record is very meager, but it appears that during the taxable years petitioner operated a gasoline plant in the Rainbow Field of Union County, Arkansas. It was engaged in

extracting natural gasoline from casinghead gas obtained under contracts with the producers or operators of the wells in that field, with all of which petitioner's plant was connected. These contracts are variously referred to in the record as "casinghead gas contracts" and "gas purchase contracts." Sixteen such contracts, each of which was entered into with the "oil lease operator" as "seller", were introduced in evidence by petitioner and marked as exhibits. A fair sample is stated by petitioner in its brief to be the contract with the Pure Oil Co. (petitioner's Exhibit 16) covering 43 leases in Union County.

This contract was originally executed by the Pure Oil Co. and Root Refineries, Inc., and subsequently the interest of the latter corporation, with the consent of the former, was assigned to the petitioner. The agreement provided, among other things, as follows:

CASINGHEAD GAS CONTRACT

This contract, made and entered into this 27th day of June, 1928, by and between The Pure Oil Company, an Ohio corporation * * * as producer, hereinafter termed the Seller, and Root Refineries, Inc., * * * hereinafter termed the Buyer: WITNESSETH:

That, whereas, the Seller owns certain oil and gas mining leases and is now operating for oil and gas under said oil and gas mining leases covering lands situated in Union County, Arkansas and described as follows:

   *      *      *      *      *      *      *

Whereas, certain wells on said lands are productive in addition to oil of what is termed casinghead gas * * * and Seller desires to sell and the Buyer to buy all of the casinghead gas produced from said wells now on said lands or that may hereinafter be produced from wells drilled thereon during the term of this contract:

Now, therefore, in consideration of the sum of One Dollar ($1.00), paid by the Buyer to the Seller, the receipt of which is hereby acknowledged, and other payments, covenants, stipulations and conditions hereinafter specified, the Seller hereby grants, bargains, sells and agrees to deliver to the Buyer, and the Buyer agrees to purchase and take from the Seller all of the casinghead gas from the wells on lands of the Seller above described, now existing and producing or that may hereafter be drilled, and that produce such casinghead gas during and for the term of three (3) years * * *.

The casinghead gas sold hereby is conveyed to the Buyer for the sole purpose of extracting natural gasoline. * * *

Buyer agrees to begin taking gas of Seller into said plant and pay for same immediately upon completion thereof * * *.

The Buyer agrees to pay Seller for each thousand cubic feet of gas taken from the premises, thirty-three and one-third per cent of the gross value of the gasoline content * * * and the sale price of gasoline, governing in said value, shall be the average quoted market price of raw gasoline of like specifications for the month for which statement is being made * * *.

Payments for gas shall be made hereunder by the Buyer not later than the twentieth of each month for all casinghead gas purchased during the preceding month * * *

Failure to pay for casinghead gas as above provided shall give the Seller the right to withhold said casinghead gas from said gasoline plant * * *

The Seller agrees to assume and be responsible for the payment to lessors or royalty owners of all royalty claims for gas taken from the premises. It is understood and agreed that the Seller may release from the contract any lease or leases in the event Seller is unable to obtain from its royalty owners an agreement to accept as their royalty share of such casinghead gas an amount not to exceed one-eighth of the proceeds from the sale of gas received by the Seller under this contract.

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

The Buyer shall, upon request of the Seller, maintain a steady vacuum on the Seller's wells, and such vacuum shall be equivalent in number of points pull, if the Seller so directs, to the existing or prevailing vacuum upon wells on offset or adjoining leases to Seller's lease. The Seller shall have, at all times, control over the degree of vacuum up to a maximum equal to points pulled on adjoining properties and the manner of applying same. &ast; &ast; &ast; No back pressure shall be maintained on any of Seller's wells without express permission from Seller.

Respondent contends (1) that the contracts in question are merely agreements of purchase and sale of casinghead gas after production, and that petitioner has no interest in the gas-producing properties for which a depletion allowance can be made, and (2) that even if petitioner acquired an economic interest in the gas in place, it had no gross or net income from such property right, and hence has no basis for computing a depletion allowance under the statute.

The first question presented here was considered by the United States Circuit Court of Appeals for the Ninth Circuit in *Signal Gasoline Corporation* v. *Commissioner*, 66 Fed. (2d) 886, and it was held that the owner of the casinghead gas contracts there involved had such an economic interest in the gas in the ground as entitled it to deductions for depletion, although the court did not discuss whether the statutory basis for the computation of such allowances existed. This conclusion of the court was predicated upon two distinct grounds, first, that the petitioner under the circumstances disclosed was in effect a joint or coproducer of the gas with the lessees, and, second, that the contracts gave the petitioner an interest which amounted to a profit *a prendre*. The opinion states:

Considered by themselves, the contracts may not specifically convey any title to gas in the ground, but the contracts confer upon petitioner the right to enter upon the land and connect its pipes directly with the oil wells, install meters, and petitioner is required to maintain vacuums on the oil wells. These provisions, together with the method of operation sanctioned by the parties whereby petitioner, by means of gas lifts, rodless pumps, and the use of compressors to create vacuums, extracted the gas that would otherwise not be produced from the premises, conferred upon it an incorporeal right to be exercised in the land in relation to the gas which was in the nature of a grant of a profit a prendre.

There is no direct evidence in the record before us to show that petitioner actually in fact assisted by any of the devices referred to above in producing the gas, although the contract required petitioner

to maintain a vacuum on the wells, if the operator so requested. However, in our opinion it is unnecessary to decide here whether petitioner was a joint producer of the gas, or by the contracts was granted a profit *a prendre*, so that it may be said to have acquired an economic interest in the gas in place. We prefer to base our decision on the second point raised by respondent. Assuming, without deciding, that petitioner had an economic interest in the gas in the ground, it is entitled to depletion deductions only if the facts bring it within the provisions of the statute authorizing such deductions.

The Revenue Act of 1928, section 114 (b)(3), provides that in the case of oil and gas wells the allowance for depletion shall be 27½ per centum of the *gross income from the property* during the taxable year, but not to exceed 50 per centum of the net income of the taxpayer from the property, except that in no case shall the depletion allowance be less than it would be if computed without reference to this provision, that is, on the basis of cost.

In the recent decision of the Supreme Court in *Helvering* v. *Twin Bell Oil Syndicate*, 293 U. S. 312, it was held that the lessee's *gross income from the property*, within the statute allowing percentage depletion, was the gross proceeds from the sale of the oil less the amount of the royalties paid.

In *Brea Canon Oil Co.*, 29 B. T. A. 1134, the petitioner was the owner of oil and gas properties, and converted casinghead gas produced therefrom into commercial gasoline in its own plant. We held that casinghead gas is a raw material used in manufacturing operations, and that only the fair market value thereof at the mouth of the well is an element in computing gross income for the purpose of determining depletion deductions. On authority of this decision we must hold adversely to petitioner's contention that its *gross income from the property* is the full amount of the gross proceeds of sale of the natural gasoline manufactured or extracted from the raw gas. Its gross income from the property must be determined on the basis of the fair market value of the gas at the mouth of the well; that is, fair market value less royalties paid.

In *Signal Gasoline Corporation*, 30 B. T. A. 568, we held that where petitioner purchased casinghead gas under contracts similar to those here involved the gross income from the production under the contracts, or the *gross income from the property*, within the meaning of the statute, is the difference between the fair market value of the gas at the well and the royalties paid therefor. We reached the same conclusion in *Greensboro Gas Co.*, 30 B. T. A. 1362, where we held that the *gross income from the property* for the purpose of computing depletion did not comprise the total proceeds from

the sale of gas after transportation through the petitioner's distribution system, but that such gross income was that portion of the total receipts which represented the fair market or field price of the gas at the wells prior to transportation, reduced by the amount of rents and royalties paid.

The royalty basis on all of the contracts involved in the instant case was 33⅓ percent of the gross value of the gasoline content, and the evidence establishes that the fair market value of the raw gas at the wells was one third of the gross gasoline receipts. Moreover, the parties are not in disagreement on this point, and since there is no difference between the fair market value of the gas at the wells and the royalty paid therefor, it follows under the rule as stated in *Signal Gasoline Corporation, supra*, that petitioner has neither gross nor net income *from the property*, and no basis for the allowance of percentage depletion. The same result is reached by applying the rule as stated in *Greensboro Gas Co., supra.* When the fair market value or field price of the gas at the wells is reduced by the amount of royalties paid, no basis remains for the computation of percentage depletion deductions.

Petitioner's argument clearly would lead to the allowance of a double deduction of the same amount. First, it would deduct for depletion 27½ percent of its gross gasoline receipts, and then the amount would be deductible a second time as the cost of the raw material entering into the manufacture of the gasoline from which it derives the proceeds of sale, and which is the basis for the depletion deduction claimed.

Petitioner contends on brief that the royalties paid were in fact less than the fair market value of the gas at the wells, and that therefore it has a basis for computing percentage depletion, although conceding that the contracts required the payment of royalties equal to one third of the gasoline receipts and that this represented the fair market value of the gas.

On the state of the record before us, we cannot agree with petitioner's argument. All the contracts provided for the payment of royalties in an amount equal to one third of the gasoline recovered, which is admitted to have been the fair market value of the gas at the wells, and there is no evidence that the contracts were modified or that they were not carried out in accordance with their provisions.

While the evidence establishes that the amount of royalties paid apparently in cash was less than one third of the gross proceeds from the sale of gasoline, and hence less than the royalties stipulated in the contracts, there is no proof that the difference between the royalties paid in cash and the amount provided by the contracts was not paid in services, materials, or other things of equivalent money value. That the royalty consideration may in fact have been

paid partly by the furnishing of vacuum service is indicated by the report of witness Morris, a petroleum engineer, introduced in evidence by the petitioner, in which it is stated that the owners in the Rainbow Field traded gas for vacuum services, " the producer waiving the royalty payments of the contracts." In the absence of proof to the contrary, we must assume that the contract royalties were paid in money and/or money's worth.

Petitioner has not only failed to bring itself within the terms of the statute providing for the allowance of percentage depletion, but it has likewise failed to show that it is entitled to depletion on the basis of cost. There is no evidence that it paid anything for the contracts in excess of the royalties. The purpose of the allowance of depletion deductions is to permit recovery of the capital invested in the depletable asset. Obviously if the taxpayer has no capital investment, he is not entitled to depletion allowances on the basis of cost. Respondent's action on this issue is approved.

*Issue (3)—Whether petitioner is entitled to compute deductions for depreciation on the unit of production basis.*—Section 23 (k) of the Revenue Act of 1928 provides that in computing net income there shall be allowed as a deduction, among other things, " a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence." The purpose of the allowance is to permit recovery of the capital investment over the period of useful life of the wasting asset, as the exhaustion occurs. Where the asset is used up or exhausted ratably by the passage of time, such result is equitably achieved by the allowance of an aliquot part of the cost or other basis in each year. This is commonly called the straight line basis of computing depreciation. But where exhaustion does not occur at a uniform rate, depreciation computed on the basis of the unit of production affords a more reasonable allowance than the straight line method, if the useful life of the asset does not exceed the period of production. Both methods are recognized by the respondent's regulations, subject to the requirement that whichever plan or method of apportionment is adopted must be reasonable and have due regard to operating conditions during the taxable period. See Regulations 74, art. 205, as amended.

The reasonableness of the method adopted depends upon the facts and circumstances of each case. In *Golconda Oil Co.*, 7 B. T. A. 955, we allowed depreciation on oil well equipment on the unit of production basis rather than the straight line basis, where it appeared that the useful life and value of the equipment depended upon the rate of extraction of the oil content. In *Evangeline Gravel Co.*, 13 B. T. A. 101, we refused to disturb respondent's action in allow-

ing depreciation on the straight line basis, where it did not appear that the equipment would not have a useful life after the gravel pit had been exhausted.

In the instant case respondent has computed depreciation by the straight line method, while petitioner contends that its deduction should be determined on the unit of production basis.

Petitioner's contention, we think, must be sustained. The record discloses that petitioner's production of gasoline increased from 893,650 gallons in 1928 to 3,414,298 gallons in 1930, and thereafter declined to 1,557,042 gallons in 1933; that when the casinghead gas in the Rainbow Field is exhausted no other source of supply will be practically available; and that upon exhaustion of the present field petitioner's plant and equipment will have a salvage value. of only 10 percent. In the light of these facts, it is our opinion that the provision of the statute for a *reasonable allowance* requires that the deductions for depreciation be computed on the unit of production basis. Respondent's action on this issue is reversed.

*Issue (4)—Whether certain expenditures in the taxable years constituted capital investments or deductible expenses.*—During 1929 petitioner expended $834.95 for a booster plant and $6,970.76 for a stabilizer, and in 1930 invested the additional amount of $102,553.48 in the booster plant. The stabilizer was not in use in February of 1931, and then had the appearance of not having been in use very long. A stabilizer does not increase but lowers the production of a gasoline plant. A booster plant is used to pick up the gas at a distance from the gasoline plant and deliver it to the compressor or absorption units. It has nothing to do with the extraction of the gasoline, but simply effects the movement of the raw material. Petitioner's booster plant was located about three miles from the gasoline plant, and was installed to bring in gas from the Crain Field.

Petitioner contends that the above mentioned expenditures were made solely to maintain output, that they did not increase production nor enhance the value of the plant, and that it is, therefore, entitled to deduct the amounts so expended in the respective taxable years as operating expenses, notwithstanding the assets acquired had a useful life in excess of one year.

Respondent resists petitioner's claim on the ground that the cost of constructing the booster plant is a capital item, returnable through depreciation, and not deductible as expense, pointing to the fact that he has consistently so held in connection with the oil and gasoline industry, respecting which his regulations differ from those for mining.

In support of its contention petitioner cites *United States* v. *Roden Coal Co.,* 39 Fed. (2d) 425; *Marsh Fork Coal Co.* v. *Lucas,* 42 Fed. (2d) 83; and *Commissioner* v. *Brier Hill Collieries,* 50 Fed.

(2d) 777. The cited cases, all of which involved coal mines, held that expenditures made to maintain but not increase the normal output of the mines, which did not reduce operating expenses nor enhance the value of the property as a whole, constituted deductible expense.

The principle applied in these decisions must be strictly limited, we think, to expenditures which clearly do not increase either the normal output or the aggregate value of the property, for it is obvious that expenditures which do either would result in the acquisition of additions or betterments to the plant, the deduction of which is specifically prohibited by section 24 (a) (2) of the Revenue Act of 1928.

The record before us contains no direct or affirmative proof that the expenditures in question did not constitute additions or betterments, and such inferences as may properly be drawn from other facts established by proof do not lead to that conclusion. So far as the record discloses, the normal capacity of petitioner's gasoline plant, as originally intended, may have been increased by the building of the booster plant, which brought in an additional supply of casinghead gas from the Crain Field. Certainly the salvage value of the petitioner's plant as a whole was increased by the additional expenditures in controversy, and this may also be true of the market value of the plant as an operating unit. In the absence of competent evidence, we can not indulge in the assumption of facts which the petitioner has the burden of proving.

In this connection it may be noted that the decisions above cited rest upon judicial approval of the respondent's regulations issued under the Revenue Acts prior to 1926. Article 222 of Regulations 45, under the Revenue Act of 1918, *relating to allowable capital items in the case of mines*, provided that the " cost of minor items of equipment and plant, necessary to maintain the nominal output * * * may be charged to current expense of operation." Identically the.same provision was contained in article 222 of Regulations 62, under the Revenue Act of 1921, and in article 224 of Regulations 65, under the Revenue Act of 1924. However, this provision was omitted from article 222 of Regulations 69, under the Revenue Act of 1926, which provides that:

Expenditures for plant and equipment, not including expenditures for maintenance and for ordinary and necessary repairs, shall be charged to capital account recoverable through depreciation.

The latter provision is continued in article 242 of Regulations 74, under the Revenue Act of 1928.

For the reasons indicated, respondent's action on this issue is approved.

*Issue (5)—Whether petitioner is entitled to certain deductions for accrued interest.*—In its return for 1930 petitioner deducted for interest an amount which included $4,499.14 accrued and charged to profit and loss on an open account due to the Henderson Co. This amount of $4,499.14 consisted of interest accrued on the books in December 1930 for the years 1928, 1929, and 1930. In computing the deficiency for the latter year respondent allowed as a deduction the amount of $1,639.23 representing interest accrued for the year 1930, and disallowed the balance of such accrual representing interest for the years 1928 and 1929.

By first amended petitions, petitioner alleged that it borrowed money from the Henderson Co. on which it agreed to pay interest at 7 percent on the average yearly balance, and that the average balance for 1929 was $31,408.05 and for 1930 was $26,855.93. In his answers to the amended petitions, respondent specifically denied all material allegations of fact contained therein, and thus put the petitioner upon proof.

At the hearing the parties stipulated that the average balance in the account of the Henderson Co. on the books of the petitioner and the amount of interest, if interest were computable at 7 percent, were as follows:

| Year | Average balance | Interest at 7 percent |
|---|---|---|
| 1928 | $24,497.37 | $428.70 |
| 1929 | 23,921.76 | 1,674.52 |
| 1930 | 23,507.68 | 1,645.54 |
| Total | | 3,748.76 |

The above stipulation was made with the specific reservation that respondent does not agree that interest upon this account is properly deductible in any amount.

At the hearing respondent also claimed such increase in the deficiency for 1930 as would result from the inclusion in petitioner's income for that year of the amount of $1,639.23 allowed as a deduction for accrued interest, on the ground that there was no legal liability on the part of the petitioner to pay interest on the account of the Henderson Co., and hence the deduction for accrued interest in 1930 had been erroneously allowed.

In support of its contentions, petitioner offered the testimony of its general auditor to the effect that in December 1930 interest was accrued on the books on the average balance of the Henderson Co. account for each of the years 1928, 1929, and 1930 pursuant to the instructions of the general manager of the petitioner corporation.

The issue joined by the pleadings of the parties filed prior to the hearing having raised specifically the question whether there was any

1060

legal obligation on the part of the petitioner to pay interest on the account of the Henderson Co., the mere proof of accrual on the books of the petitioner is insufficient, we think, to establish the liability, respondent's contention being that the accrual was erroneous because of the lack of a legal obligation to pay. There is no proof that any interest was in fact ever paid, nor that the petitioner was legally liable to pay interest, or, if so, at what rate, nor that the general manager of petitioner was authorized to direct the accrual, and it appears that no interest was accrued for 1928 or 1929 until in December 1930. In these circumstances the interest deduction claimed by the petitioner for 1928 and 1929 must be disallowed for lack of proof.

Petitioner further contends that in any event the increased deficiency for 1930 claimed by respondent must be denied for the reason that the burden was upon respondent to prove that the allowance of the deduction for that year was erroneous, and no proof on this point was offered by respondent.

In the situation presented here, we think that petitioner's argument is sound. No duty rests upon the petitioner to offer testimony with respect to an issue on which the burden of proof rests on the respondent. The presumption was that what had been done by the Commissioner was correct. No testimony was offered to show that it was not. We therefore hold that the revisions in deficiencies asked for by respondent should not be allowed.

*Judgment will be entered under Rule 50.*