D. LOVEMAN & SON EXPORT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

D. LOVEMAN & SON, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 71711, 71712. Filed August 5, 1960.

*Richard Katcher, Esq.*, and *Sheldon J. Gitelman, Esq.*, for the petitioners.

*William O. Allen, Esq.*, for the respondent.

**OPINION.**

RAUM, *Judge:* 1. *Valuation of First Quality Inventory.*—We think petitioners erred, during the taxable years in question, in continuing to value their first quality inventories by reference to the published mill price of the major mill producers.

Section 22(c), I.R.C. 1939, provides for the use of inventories by taxpayers "upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income." Pursuant to this delegation, the Commissioner has approved the method of valuing inventories at the lower of cost or market, Regulations 111, section 29.22(c)–2, Regulations 118, section 39.22(c)–2, and has further provided in Regulations 111, section 29.22(c)–4, and Regulations 118, section 39.22(c)–4(a), that:

Under ordinary circumstances and for normal goods in an inventory, "market" means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayers * * *

The parties are in basic disagreement as to what petitioners' "market" was during the years involved herein. Petitioners argue that the "combination of unusual circumstances" which "temporarily prevented [them] from buying their steel requirements from their usual sources did not effect any change in [their] market for inventory valuation purposes, nor require them to change their customary method of inventory valuation." In support of this contention, they point out that the major mills produced "close to 100 per cent" of all the carbon steel plate rolled in the United States, and that the determination of market value by reference to the published prices of those mills was not only "consistent with petitioners' prior practice, but * * * customary in the steel warehouse business."

Respondent, on the other hand, maintains that the term "particular merchandise," as used in the above-quoted regulation, refers only to the steel which was available to the petitioners during the taxable years in question and, therefore, that petitioners' market did

not include steel produced by the major mills. The record, viewed in the light of applicable precedent, compellingly supports respondent's position on this issue.

With respect to first quality merchandise, the term "market," in the phrase "lower of cost or market," means the price which petitioners would have had to pay to replace items in their inventories on the applicable inventory dates. Conversely, it does not mean the price at which such merchandise is resold or offered for resale. *Elder Mfg. Co.* v. *United States*, 10 F. Supp. 125 (Ct. Cl.) ; *Ideal Reversible Hinge Co.*, 7 B.T.A. 1066; see also *Frederick A. Stearns*, 8 B.T.A. 884, 887; *Charles N. Winship*, 10 B.T.A. 237, 240. This point is recognized in the regulations by the specific reference therein to "*bid price* * * * for the particular merchandise in the volume in which usually *purchased* by the taxpayer * * *." (Emphasis supplied.) In short, we are concerned here with petitioners' *replacement* market and not their resale market.

It is clear that as late as August 31, 1953, petitioners were unable to purchase steel from the major mill producers. Loveman testified specifically that after the fall of 1951 neither Export nor Domestic was able to purchase steel from a major mill until September or October of 1953. And Central's price for carbon steel plate did not drop to a level equal to that of the major mills until the close of 1953. Thus, in determining the market for petitioners' prime inventory items as of December 31, 1951, December 31, 1952, and August 31, 1953, it would be catering to fiction rather than fact to refer, as petitioners did, to the prevailing prices charged by the major mills. As of the foregoing inventory dates, those mills represented an inaccessible purchase market to petitioners.

The fact that Central's rated capacity for sheared carbon steel plate at the beginning of 1951 was only about 3 per cent of the total industry rated capacity for such plate does not affect our conclusion in this regard. The greater percentage of national capacity represented by the major mills remained unavailable to petitioners, and constituted a market distinct from that in which petitioners purchased. Petitioners' position was not unique in the steel warehousing industry; at no time did Domestic take more than 10 per cent of Central's output, and Central was only one of a number of premium mills. Moreover, steel purchased at premium prices was not in fact competitive with steel purchased at major mill prices during most of the period in question. At the close of 1951, the demand for steel was sufficiently great to absorb all of Domestic's first quality inventory at the full 50 per cent markup over premium cost permitted by C.P.R. 98. Thus, first quality steel purchased from a premium mill had an economic dimension significantly different from

otherwise identical steel purchased from a major mill at lower costs; the former could readily be resold at about $10 per cwt. (50 per cent over premium cost) whereas the resale price for the latter was limited to about $6 per cwt. (50 per cent over major mill cost). After C.P.R. 98 was withdrawn in March 1953, and throughout the remainder of the period involved herein, petitioners still had no difficulty in disposing of their prime steel at a substantial profit, even though demand was gradually declining from its exceptionally high Korean war levels. In any event, regardless of the fluctuations of demand for steel, petitioners' replacement market did not encompass the major mills until September or October of 1953, and it is that replacement market which should have controlled the inventory valuation of petitioners' first quality merchandise for the inventory dates prior thereto.

Petitioners have devoted a considerable portion of their brief to the argument that the temporary dislocation of their regular sources of supply, caused by the Korean conflict, is an insufficient reason for changing the basis consistently used by them in pricing their inventories, that is, cost or major mill price, whichever is lower. They state that respondent's adjustments have, in effect, placed petitioners on a strictly cost basis for pricing inventory, ignoring the alternative basis of market. We disagree.

It is indeed true that the Commissioner's regulations attach greater weight to consistency than to any particular method of inventorying or basis of valuation, but only so long as the method or basis used clearly reflects income.[1] In our judgment, petitioners' continued reference during the years in question to major mill prices as a basis for valuing first quality inventory actually distorted income for those years.

Moreover, petitioners are not accurate in asserting that the method of valuing inventories during the tax years was consistent with the method previously employed. It was consistent only in the misleading sense that market values were determined by the posted prices

---

[1] Regs. 111, sec. 29.22(c)-2; Regs. 118, sec. 39.22(c)-2, both of which state as follows:

VALUATION OF INVENTORIES.—Section 22(c) provides two tests to which each inventory must conform:

(1) It must conform as nearly as may be to the best accounting practice in the trade or business, and

(2) It must clearly reflect the income.

It follows, therefore, that inventory rules cannot be uniform but must give effect to trade customs which come within the scope of the best accounting practice in the particular trade or business. In order clearly to reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation so long as the method or basis used is substantially in accord with these regulations. An inventory that can be used under the best accounting practice in a balance sheet showing the financial position of the taxpayer can, as a general rule, be regarded as clearly reflecting his income.

of the major producing mills. But, in the period prior to the tax years petitioners actually bought their steel from the major producing mills and the posted prices of such mills in fact accurately represented the market price for the steel in the very market that petitioners acquired it. In contrast, during the period in controversy, that market was closed to petitioners, and it is highly fallacious to contend that petitioners were consistently employing the same method. They were not because, during the period in controversy, they were not relating market values to the market in which they bought or could buy their inventory.

Whatever the defects of the lower of cost-or-market method in actual practice, its underlying theory, as stated in Finney and Miller, Principles of Accounting (Intermediate) (5th ed. 1958), is as follows (p. 251):

> The cost-or-market basis of inventory pricing conforms with an old rule of accounting conservatism often stated as follows: Anticipate no profit and provide for all possible losses. If market purchase prices decline, it is assumed that selling prices will decline with them; reducing the inventory valuation to market purchase price reduces the profit of the period when the cost price decline took place and transfers the goods to the next period at a price which will presumably permit the earning of a normal gross profit on their sale. If the market purchase price increases, the inventory is valued at cost so that a profit will not be anticipated.

Petitioners' continued use of major mill prices in determining market represents an application of the cost-or-market method which is wholly *inconsistent* with the theory of that method as above expounded. By the automatic reduction of inventory values from cost to major mill price, petitioners provided for losses which were not in fact anticipated. As previously pointed out, petitioners at all relevant times were able to dispose of their first quality items at prices 50 per cent above premium cost or, in any event, at prices substantially exceeding such cost.

Contrary to petitioners' contention, it is respondent's valuation of the inventories in question that more closely complies with the lower of cost or market method. As long as petitioners were able to purchase their requirements from the major producers, actual cost and replacement cost (i.e., market) for first quality merchandise were normally the same. This is so because petitioners were usually able to resell their prime inventory before any dramatic decline in major mill prices. The same situation prevailed during the years involved herein with respect to petitioners' inventories of first quality steel purchased at premium prices. Thus, petitioners' replacement cost for prime steel approximated actual cost at all times relevant to disposition of the issue at hand, and respondent's determinations, based on actual cost, reflect this fundamental fact.

Our conclusion on this issue is based on the proposition that market value, even for inventory purposes, must be related to relevant facts and market conditions prevailing as of the date such value is to be determined. The instant case is analogous to *E. T. Bamert*, 8 B.T.A. 1099, where the taxpayer, a sheep grower in San Joaquin County, California, inventoried his ewes by the farm price method, using the price per head prevailing in San Joaquin County at the close of each year. The respondent in that case adjusted the taxpayer's valuation of inventory on the basis of values taken from other States and "somewhat distant localities." We disapproved respondent's adjustments, stating as follows at page 1100:

Petitioner was located in, or near, central California. There he bought and sold his sheep. That locality was his market, and it is by the prices of that market, and not some distant one, that the value of his goods should be fixed. * * *

In a like sense, petitioners' market during the years in question did not encompass the major mills, and we can find no factual underpinning for the valuation of its first quality inventories by reference to major mill prices. Cf. *Jacob J. Cooley*, 33 T.C. 223.

Accordingly, respondent's revaluation of petitioners' prime inventories as of December 31, 1951, December 31, 1952, and August 31, 1953, must be sustained.

2. *Valuation of Items Classified as Second Quality Steel and Scrap.*—Petitioners' inventories of items classified as second quality steel and scrap developed in part from the in-warehouse processing of first quality items; in the case of Domestic at least, other second quality material developed from merchandise purchased as first quality, but which was discovered upon subsequent inspection or processing to be defective. With the exception of material designated as mill "excess" or "overruns," [2] it appears on this record that most steel rolled by producing mills is sold to warehousemen or dealers as first quality. Thus, there is in general no replacement market to which we may refer in determining, for inventory purposes, the market value of second quality and scrap items. In these circumstances, Regulations 111, section 29.22(c)–2, and Regulations 118, section 39.22(c)–2(c), provide as follows with respect to the valuation of such merchandise:

Any goods in an inventory which are unsalable at normal prices or unusable in the normal way because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes, including second-hand goods taken in exchange, should be valued at bona fide selling prices less direct cost of disposition, * * * but in no case shall such value be less than the scrap value. Bona fide selling price means actual offering of goods during a period

---

[2] It does not clearly appear that "overruns" were in general physically distinguishable from steel acquired as first quality, or that petitioners did not in fact resell such merchandise in the same manner as steel acquired as first quality.

ending not later than 30 days after inventory date. The burden of proof will rest upon the taxpayer to show that such exceptional goods as are valued upon such selling basis come within the classifications indicated above, and he shall maintain such records of the disposition of the goods as will enable a verification of the inventory to be made.

The only inventories in which petitioners allege they had second quality steel or scrap are those of Domestic as of December 31, 1952, and December 31, 1953, and that of Export as of August 31, 1954. After careful examination of the evidence and testimony of record, and bearing in mind that the burden of proof with respect to market value is upon petitioners, we have concluded that the values accorded by Loveman and Merlin to the inventory items in question did not represent "bona fide selling prices less direct cost of disposition," as required by the applicable regulations.

Merlin's testimony attempted to establish that petitioners priced their second quality items "at what we thought we could sell it for." Apart from his evasiveness at various points which shook our confidence in him as a reliable witness, our difficulty in accepting this testimony as accurate stems from several factors, all clearly established by the record:

(1) The value of $3 per cwt. accorded to petitioners' second quality merchandise cannot be reconciled with typical prices at which such merchandise was ultimately sold. Exhibits compiled by Merlin himself, or under his supervision, show that Domestic succeeded in disposing of most of its second quality items at prices ranging between $5.50 and $9 per cwt., occasionally ranging even higher. And it should be noted that these prices were obtained during a period which included 1953, 1954, and 1955, when the demand for steel was declining from the exceptionally high levels of the Korean war years. The lowest selling price shown for a 1953 inventory item classified as second quality was $4.25 per cwt. If the differential between inventory price and actual selling prices were less dramatic, we might perhaps conclude that Merlin's testimony was reliable and that the values accorded to petitioners' second quality inventories merely represented conservative estimates of bona fide selling prices. But the differential being so substantial, and lacking a satisfactory explanation therefor, we cannot reasonably reach that conclusion.

(2) Petitioners priced *each* of its second quality items at $3 per cwt., regardless of the type of defect involved. Given the wide range of selling prices shown on the aforementioned exhibits, it is difficult to comprehend why a uniform value was accorded to each second quality inventory item, unless such value was not in fact based on bona fide selling prices. In this connection, Regulations

111, section 29.22(c)–4, and Regulations 118, section 39.22(c)–4(c), require that—

Where inventory is valued upon the basis of cost or market, whichever is lower, the market value of *each article* on hand at the inventory date shall be compared with the cost of *the article*, and the lower of such values shall be taken as the inventory value of the article. [Emphasis supplied.]

(3) Merlin's testimony itself occasionally departed from his original position that the inventory value of $3 per cwt. was based on bona fide selling prices. For example, under questioning by the Court, Merlin pointed out that certain excess material could be purchased as such from the mill at cost prices below those of first quality items. He then testified as follows:

THE COURT: These prices that you fixed—that is the prices you fixed under $3.90, are they actually comparable to the prices that you in fact sold such pieces for at or around that time or does the price that you fix represent some sort of mental value that you put on this?

THE WITNESS: No, it is not mental value, it is what you feel is a fair market value based on the condition and the size of the material, and as I mentioned just a little while ago, *it is also in relation to the mill price for excess material*—into which category something like that might fall or would fall. [Emphasis supplied.]

Of course, to the extent that second quality merchandise was priced in relation to mill prices for excess material, such value would be in direct contravention of the requirement that defective items be valued at "bona fide selling prices less direct cost of disposition." There is a similar suggestion in Loveman's testimony as to the basis actually used in valuing petitioners' second quality items. On direct examination, Loveman testified as follows:

Q. Now speaking generally, if on taking your inventory you find steel in your inventory which is second quality because it contains one of these conditions you mentioned, how do you value that steel for purposes of inventory?

A. Well we figure it has a greater value than scrap in most cases, because we figure that we can process it by welding and machining and that it will have some salvagable [sic] use, and *so we will put a price on it somewhere between scrap price and the prime price.* [Emphasis supplied.]

It is unlikely that the term "prime price," as used by Loveman, was intended to refer to petitioners' selling prices for prime steel, since his testimony was specifically directed to petitioners' basis of valuation *for inventory purposes*, and petitioners never in fact valued their prime inventory by reference to the resale price therefor. Thus, the apparent thrust of Loveman's statement is that the figure of $3 per cwt. at which second quality items were priced represented an intermediate point between the major mill price ($3.90 per cwt. as of December 31, 1952) which petitioners used in pricing their first quality items and the scrap price ($2 per cwt. as of December 31, 1952) which petitioners used in pricing other in-

ventory items. This basis of valuation, if in fact used by petitioners, in no way reflects bona fide selling prices for petitioners' second quality inventories and, consequently, would be clearly in violation of the Commissioner's regulations. Moreover, we held in the first part of our Opinion that the prevailing major mill price was itself substantially below the correct inventory value for petitioners' first quality items. The method described by Loveman of valuing second quality items merely compounds that error; it would, however, explain the gap between the inventory value of $3 per cwt. and the much higher prices at which petitioners' second quality items were ultimately sold.

The differential between inventory values and sales prices is even more extreme with respect to inventory items treated as scrap. For example, as pointed out in our findings, most of the items priced at $1 per cwt. as of December 31, 1953, were sold in 1954 and 1955 at prices generally ranging from about $5.50 per cwt. to $8.50 per cwt., and in one instance ranging as high as $12.09 per cwt. The lowest sales price shown for a 1953 inventory item valued as scrap was for an item sold in 1954 at prices ranging from $3.25 per cwt. to $8.80 per cwt. Between December 31, 1952, and December 31, 1955, the record discloses only one sale at scrap prices even though there was a ready market for scrap during these years, and it is not even clear whether that sale represented an item previously included in closing inventory or an item subsequently acquired; most of the items valued by Loveman and Merlin as scrap for inventory purposes were sold during 1953, 1954, and 1955 at prices approximating or exceeding cost. Some items may have been sold to scrap dealers for cash without being recorded on petitioners' books in any identifiable fashion, but such sales were few, if any.

Petitioners suggest that the possibility of having to absorb processing costs was taken into account in valuing their second quality and scrap inventories. We are satisfied that petitioners did incur occasional processing costs in disposing of defective items, but the evidence and testimony regarding the amount of such costs is so vague that we have been unable to make any meaningful findings with respect thereto. Merlin could not tell us the amount of those costs in any year, nor could he identify the accounts to which they were customarily charged on petitioners' books. He estimated that the cost of "planing" off-gauge material might have run as high as $5 to $6 per cwt., including freight to and from the planer, but on cross-examination he admitted that less than 10 per cent of petitioners' off-gauge steel was actually sent out for planing. Moreover, the occasional items which were planed could then be resold as first quality standard gauge items at approximately $10 per cwt., leaving a net sales price (gross sales price less processing

costs) of $4 or $5 per cwt. as compared with the value of $3 per cwt. accorded for inventory purposes. Defective steel other than off-gauge was processed, when necessary, in petitioners' warehouses. Merlin estimated that only about half of such additional material required processing, and that the cost of such in-warehouse operations (e.g., "cutting") ranged from a low of 25 cents per cwt. to a high of $2 per cwt. The little evidence there is on the point shows that such costs were actually closer to 25 cents per cwt. than to $2 per cwt.; and frequently they were billed to customers as an addition to the selling price of the steel involved, rather than absorbed by petitioners.

Respondent submitted an exhibit consisting of a trial balance of Domestic's profit and loss accounts for the years 1951, 1952, and 1953. Other than the freight account, this balance contains only a limited number of accounts to which processing costs could have been charged; they are as follows:

| Account | Total charge | |
|---|---|---|
| | 1952 | 1953 |
| Warehouse salaries | $35,486.74 | $32,876.52 |
| Warehouse supplies | 2,431.40 | 2,391.44 |
| Warehouse miscellaneous expense | 24.75 | 597.14 |
| | 37,942.89 | 35,865.14 |

Considering that a large portion of these expenses must have been applicable to purchases and sales made during the course of the taxable year, rather than to closing inventory items, and given the indefinite nature of petitioners' case in regard to the amount of processing costs, we can only conclude that such costs were considerably less significant than petitioners would have us believe. In any event, they did not account for the substantial amount by which actual selling prices typically exceeded inventory values.

Petitioners also urge that numerous second quality and scrap items were carried in inventory for several years before being liquidated, and that the unsalability of these items affected their valuation for inventory purposes. As we read the record, this is not an accurate description of the status of petitioners' inventories. While it is true that many such items were not *completely* disposed of for several years, they were being *gradually* liquidated between December 31, 1952, and December 31, 1955, at prices approximating or exceeding cost. We do not agree that petitioners at any point had large quantities of "unsalable" steel in their inventories; whatever the uncertainties existing with respect to the resale of petitioners' second quality items, they were insufficient to justify the consistently low prices at which those items were valued.

Petitioners have failed completely to substantiate their valuation of inventory items classified as second quality and scrap. In our opinion, respondent's determinations (except for the inventories of December 31, 1953, and August 31, 1954), based on revaluation of the items in question at cost, more accurately reflect the resale market for petitioners' second quality and "scrap" steel during the years involved herein. Cf. *American Mills Co.*, 2 B.T.A. 460; *Karges Hosiery Co.*, 8 B.T.A. 767; *Justus & Parker Co.*, 13 B.T.A. 127; *Cleveland Automobile Co.* v. *United States*, 70 F. 2d 365 (C.A. 6).

As to the inventories of December 31, 1953, and August 31, 1954, a different picture is presented. It must be remembered that the great bulk of petitioners' second quality and scrap steel had been purchased by them as first quality steel in a market outside that of the major steel-producing companies. But, by the end of 1953, the latter market, with its lower prices, was again open to petitioners, which could then buy first quality steel at prices that were lower than the actual costs incurred by them in acquiring their inventories. It is for that reason that the Commissioner has abandoned his position as to revaluation of first quality steel as of December 31, 1953, and he now accepts the prices of the major steel-producing mills as of that date as a measure of the market value of the first quality inventory. His failure to make a similar concession as to petitioners' second quality and scrap steel produces the incongruous situation that the prices for first quality steel would be lower than the ones for second quality and scrap steel. We cannot approve any such bizarre result. On the other hand, since such second quality and scrap steel was in fact being sold for prices that were generally higher than the applicable prices of the major steel producers for first quality steel, we must conclude that the proper inventory prices for the former cannot be less than the latter.

3. *Treatment of "Freight-in" by Domestic.*—Domestic contends that because it has consistently treated its "freight-in" expenditures as a current expense it should be permitted to continue to do so. This argument is unsound, for it assumes, without justification, that the otherwise erroneous treatment of an item becomes acceptable if practiced consistently.

The pertinent regulations clearly require that "freight-in" expenditures be accounted for as part of the cost of acquiring merchandise, and not as a current expense.[3] Furthermore, the treat-

---

[3] Regs. 111, sec. 29.22(c)–3, and Regs. 118, sec. 39.22(c)–3(b), provide in part that "cost" as it applies to inventories means "the invoice price less trade or other discounts, except strictly cash discounts approximating a fair interest rate, which may be deducted or not at the option of the taxpayer, provided a consistent course is followed. To this net invoice price should be added transportation or other necessary charges incurred in acquiring possession of the goods."

ment of "freight-in" required by the regulations is in accord with better accounting principles and more clearly reflects income than the procedure followed by Domestic. Cf. *May, Stern & Co.*, 20 B.T.A. 241, affirmed 56 F. 2d 1034 (C.A. 3); *Gus Blass Co.*, 18 T.C. 261, affirmed 204 F. 2d 327 (C.A. 8). As such, the requirement is clearly within the Commissioner's authority under section 22(c), I.R.C. 1939, to prescribe inventory methods which conform "as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income."

As indicated by our findings, the record does not provide a satisfactory basis for determining with any exactitude the amount of "freight-in" applicable to Domestic's inventories as of December 31, 1952, and December 31, 1953. Respondent's agent was able to determine the precise amount of "freight-in" applicable to Domestic's inventory as of December 31, 1951. Absent sufficient records to make a similar determination for 1952 and 1953, the agent computed the ratio that the "freight-in" applicable to Domestic's 1951 inventory bore to the cost of that inventory, exclusive of "freight-in"; he then applied the percentage thus derived to the cost, exclusive of "freight-in," of Domestic's closing inventories for 1952 and 1953. In the circumstances, we think that the procedure followed by the agent was reasonable, but our own computations, which are based on stipulated figures, indicate an apparent error in the agent's arithmetic. He computed the aforementioned ratio to be approximately 10 per cent whereas our computations indicate a ratio of 8 per cent. The figure of 8 per cent also appears to be more in line with the result achieved by applying the prevailing truck rates to the total weight of Domestic's closing inventories in 1952 and 1953. Consequently, we think that applicable "freight-in" for 1952 and 1953 should be recomputed by applying the ratio of 8 per cent to the cost of Domestic's closing inventories, exclusive of "freight-in," in those years.

4. *Deductibility of "Interest" Accrued by Export.*—Export admits that prior to the summer of 1954, it was not subject to any obligation to pay interest on its indebtedness to Domestic, nor was there any agreement at the time such indebtedness was incurred that interest would be charged at some future date. According to Loveman's testimony, the decision to charge interest to Export was reached at some unspecified time during the summer of 1954 at a "general discussion that we had between the stockholders, maybe over lunch or something like that, and maybe one of the attorneys there." Although the amounts subsequently entered upon Export's books as interest owing to Domestic were accrued only with respect to the monthly balances of indebtedness during 1954, and not with respect to similar balances in any previous year, we think the gen-

eral rule—that interest may not be accrued where there is no obligation to pay interest—nevertheless applies.

In *Howell Turpentine Co.*, 6 T.C. 364, reversed on another issue 162 F. 2d 316 (C.A. 5), the taxpayer, over a period of 9 years, had borrowed money on open account from the corporation of which he was the principal stockholder. Prior to December 1940, the taxpayer was not subject to any obligation to pay interest to the corporation, nor did he in fact pay any interest. On December 26, 1940, he repaid the principal of his loans, plus an additional amount allegedly representing interest at 6 per cent computed on the average yearly balances owing to the corporation during the aforementioned 9-year period, which included the taxable year in question. We held that respondent correctly disallowed the taxpayer's deduction—not only for interest accrued with respect to prior years, but also with respect to 1940, because there was no obligation to pay interest at any time prior to December 1940. The same result follows from the facts of the instant case. Cf. *A. Backus, Jr., & Sons*, 6 B.T.A. 590; *Rainbow Gasoline Corporation*, 31 B.T.A. 1050. Accordingly, we sustain respondent's disallowance of the interest deduction claimed by Export on its return for the fiscal year ended August 31, 1954.

5. *Cost of Paving Perkins Road.*—During its fiscal year ended August 31, 1953, Export contributed $8,279.29 toward the cost of paving Perkins Road, a dead end street adjoining its warehouse premises. On its return for the fiscal year ended August 31, 1953, Export claimed a depreciation deduction with respect to its expenditure, based on a 20-year useful life for the road. Respondent disallowed this deduction. In its petition, Export alleged that the entire amount of its contribution toward paving was deductible in fiscal 1953 as an ordinary and necessary business expense. On brief, and in the alternative, Export argues that the amount in question, if not entirely deductible in the year incurred, was depreciable over a 15-year period rather than the 20-year period estimated on its tax return.

We think that Export's original treatment of its paving expenditure, as a capital outlay depreciable over a 20-year period was correct. It is well established that such expenditures are capital in nature rather than ordinary and necessary business expenses. *L. Z. Dickey Grocery Co.*, 1 B.T.A. 108; *E. W. Edwards & Sons*, 3 B.T.A. 889; *E. W. Edwards and Son* v. *Clark*, 29 F. Supp. 671; *Lord & Bushnell Co.*, 7 B.T.A. 86; *Wood* v. *Commissioner*, 245 F. 2d 888 (C.A. 5), affirming on this issue T.C. Memo. 1955–301; *Algernon Blair, Inc.*, 29 T.C. 1205; *Frank B. Cooper*, 31 T.C. 1155. As a capital expenditure, the cost of paving Perkins Road·is depreciable if the road constitutes "property used in the trade or business" of

Export. Sec. 23(1), I.R.C. 1939. In our opinion, Perkins Road meets that statutory requirement. It adjoined Export's warehouse premises, and those premises would have been inaccessible by truck but for such paving. In short, the road was a necessary and integral part of Export's general warehouse operation.

Respondent's only argument in opposition to this conclusion is that at the time Export acquired its warehouse premises the fee title to Perkins Road was probably vested in the local municipality under Ohio statutes. The record is quite vague with respect to who had title to the road. But assuming, without deciding, that fee title was vested in the local municipality, we fail to see how that affects our conclusion. The paving was not undertaken to improve the fee. It was required as an essential adjunct to Export's warehouse facilities, and the road was undoubtedly used in Export's trade or business. In *E. W. Edwards & Sons*, 3 B.T.A. 889, the taxpayer constructed tunnels under public streets in Rochester, New York, in order to connect various department store buildings which it operated. The construction of the tunnels was authorized by municipal ordinances and licenses. We held, as follows, at page 891:

The taxpayer's tunnels were constructed under municipal ordinances, and so long as such ordinances remain unrepealed, the right to use such tunnels and the cost of their construction must be presumed to have a continuing capital value to the taxpayer's business. The cost of constructing such tunnels should be treated as a capital expenditure, subject to an allowance for exhaustion of the construction cost.

The case of *Algernon Blair, Inc.*, 29 T.C. 1205, cited by respondent, is not in point. In that case, we found that the improvements in question had been turned over by the taxpayer to the local government; that the local government maintained the improvements; that the streets and roads involved had been incorporated into the municipal and county road systems, and were used "primarily in the public business" rather than in the taxpayer's business. In the instant case, we have found that the local government refused to pave Perkins Road when requested to do so by the interested property owners. In fact, the village officials suggested that the property owners pave the road themselves. Although Perkins Road was open to public use, it was not used "primarily in the public business"; it was a dead end street adjoining Export's warehouse and was used primarily in Export's business and the businesses of others who contributed toward the paving.

The issue with respect to whether the useful life of the road was 15 or 20 years was not raised by the pleadings and is not properly before us. *Erwin Gerber*, 32 T.C. 1199. In any event, Export has

**808**

not shown that respondent erred in failing to allow a useful life shorter than 20 years.

*Decisions will be entered under Rule 50.*