Logan Lumber Company, a Florida corporation v. Commissioner.
Logan Lumber Co. v. Commissioner
Docket No. 95323.
United States Tax Court
T.C. Memo 1964-126; 1964 Tax Ct. Memo LEXIS 209; 23 T.C.M. (CCH) 735; T.C.M. (RIA) 64126; May 6, 1964
Michel G. Emmanuel and Norman H. Lipoff, for the petitioner. Richard W. Roe, for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined the following deficiencies in income tax and addition to tax: Addition to Tax
Sec. 291(a),
I.R.C.
Year Ended
Deficiency
1939
6/30/51
$39,066.72
6/30/52
34,426.88
$8,606.72
6/30/53
0
6/30/54
$16,006.33
6/30/55
57,056.24
6/30/56
6,192.36
6/30/57
35,650.06
6/30/58
0
6/30/59
18,464.51
6/30/60
0
Some of the issues raised by the pleadings have been settled by stipulation, and one issue involving respondent's determination of a reasonable salary for Donald A. Logan for the fiscal years ending June 30, 1951 to June 30, 1957, inclusive, has been conceded by petitioner on brief. The remaining issues are: 1. Were salaries paid by petitioner to its officers, W. W. Logan, Sr. *211 , W. W. Logan, Jr., and Mattie R. Logan, reasonable compensation for services rendered? 2. Did the payments made by petitioner to Rome Avenue Corporation constitute rent required to be paid as a condition to the continued use or possession of property? 3. Did petitioner understate its closing inventory for the fiscal year ended June 30, 1952, by the amount of $58,830? 4. Was petitioner's failure to timely file its Federal income tax return for the year ended June 30, 1952, due to reasonable cause? Findings of Fact Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference. Background Facts and Compensation Issue Petitioner, a Florida corporation, was organized on July 1, 1935. Its fiscal year begins July 1st and ends June 30th. It filed its income tax returns (on an accrual basis) for the years ended June 30, 1951 through June 30, 1960, with the district director of internal revenue, Jacksonville, Florida. From July 1, 1950 to June 30, 1960, petitioner's stock was owned in the following proportions: 7/1/50 to
12/22/51 to
12/24/52 to
12/16/54 to
12/21/51
12/23/52
12/16/54
6/30/60
W. W. Logan, Sr.
60%
56%
51.5%
50.42%
Mattie R. Logan
20%
16%
11.5%
2.96%
W. W. Logan, Jr.
10%
11%
12%
13.07%
Sara B. Logan (wife of W. W. Logan, Jr.)
1%
2%
3.07%
Lamar Logan (son of W. W. Logan, Jr.)
1%
2%
3.07%
Allen Logan (son of W. W. Logan, Jr.)
1%
2%
3.07%
Donald A. Logan
10%
11%
12%
13.07%
Mary H. Logan (wife of Donald)
1%
2%
3.07%
Nancy Sue Logan (daughter of Donald)
1%
2%
3.07%
Kathryn Joan Logan (daughter of Donald)
1%
2.06%
Donald J. Logan (son of Donald)
1%
2%
3.07%
100%
100%
100%
100.00%
*212 W. W. Logan, Sr., and Mattie R. Logan are husband and wife. W. W. Logan, Jr., and Donald A. Logan are sons of W. W. Logan, Sr., and Mattie R. Logan. During the fiscal years ending June 30, 1951, and June 30, 1952, petitioner's officers were W. W. Logan, Sr., president, W. W. Logan, Jr., vice president, Donald A. Logan, secretary, and Mattie R. Logan, treasurer. After August 2, 1952, petitioner's officers were W. W. Logan, Sr., chairman of the board, W. W. Logan, Jr., president, Mattie R. Logan, vice president, and Donald A. Logan, secretary-treasurer. They were also the members of petitioner's board of directors. In its returns for the fiscal years ended June 30, 1951 through June 30, 1960, petitioner deducted the following salaries paid to its officers: W. W. Logan,
W. W. Logan,
Donald A.
Mattie R.
Year
Sr.
Jr.
Logan
Logan
1951
$72,000.00
$30,000.00
$24,000.00
0
1952
72,000.00
30,000.00
24,000.00
0
1953
50,000.00 [1]
38,250.00
37,750.00
$9,000.00
1954
48,000.00 [1]
39,000.00
39,000.00
9,000.00
1955
48,000.00
39,000.00
39,000.00
9,000.00
1956
48,000.00
39,000.00
39,000.00
9,000.00
1957
42,000.00
37,500.00
19,500.00
9,000.00
1958
24,000.00
24,000.00
0
6,000.00
1959
21,000.00
27,000.00
0
3,600.00
1960
18,000.00
30,000.00
0
1,200.00
*213 After a review and audit of petitioner's returns, respondent allowed deductions of the following amounts as officers' salaries: W. W. Logan,
W. W. Logan,
Donald A.
Mattie R.
Year
Sr.
Jr.
Logan
Logan
1951
$50,000.00
$18,000.00
$12,000.00
0
1952
50,000.00
18,000.00
12,000.00
0
1953
50,000.00 [1]
20,000.00
15,000.00
0
1954
48,000.00 [1]
20,000.00
15,000.00
0
1955
48,000.00
20,000.00
15,000.00
0
1956
48,000.00
20,000.00
15,000.00
0
1957
42,000.00
20,000.00
7,500.00
0
1958
24,000.00
20,000.00
0
0
1959
21,000.00
20,000.00
0
0
1960
18,000.00
20,000.00
0
0
In its returns for the years ended June 30, 1944 to June 30, 1950, inclusive, petitioner deducted the following amounts as officers' salaries: W. W.
W. W.
Logan,
Logan,
Donald A.
Year
Sr.
Jr.
Logan
1944
$24,000
$12,000
$ 7,500
1945
24,000
12,000
7,500
1946
24,000
12,000
7,500
1947
36,000
18,000
12,000
1948
36,000
18,000
9,000
1949
60,000
18,000
12,000
1950
60,000
18,000
12,000
*214 A salary of $9,000 was paid to Mattie R. Logan during each of its taxable years ended June 30, 1949 through June 30, 1952. "On advice of" the certified public accountant employed by petitioner during those years no deductions were claimed in its returns for such payments. Petitioner employed another certified public accountant in 1952 and "on advice of" this accountant deductions were claimed for amounts paid to Mattie R. Logan as salary during the year ended June 30, 1953, and subsequent years. Petitioner's sales and net income (after deduction of officers' salaries) were as follows: Year
Sales
Net Income
1951
$3,773,598.00
$258,849.00
1952
3,217,889.00
51,916.00 (loss)
1953
3,352,680.00
43,816.00 (loss)
1954
2,933,504.00
42,629.00 (loss)
1955
3,799,542.00
57,636.00
1956
4,176,514.00
47,975.00 (loss)
1957
4,361,845.00
19,990.00
1958
3,911,843.00
59,632.00 (loss)
1959
2,872,156.00
23,242.00
1960
3,045,153.00
42,367.00 (loss)
Petitioner has never declared or paid a cash dividend. It had the following earned surplus and undivided profits: Year Ended
June 30
Amount
1951
$554,700.00
1952
518,066.00
1953
472,903.00
1954
429,917.00
1955
483,094.00 *
1956
425,421.00 *
1957
444,266.00 *
1958
359,219.00 *
1959
382,920.00 *
1960
339,079.00 *
*215 W. W. Logan, Sr., was born May 3, 1887. After graduating from high school, he was employed by a bank in Meridian, Mississippi, and in about 1909 became a lumber buyer for a furniture factory. He entered the wholesale lumber business on his own behalf in 1913 and during World War I specialized in securing scarce items of lumber for the United States Government. In 1929, W. W. Logan, Sr., moved to Tampa, Florida, with his wife and two sons and entered the wholesale lumber business with others. In 1930, he opened his own business at the location which the petitioner, Logan Lumber Company, still occupies. He operated as an individual until 1935 when he incorporated as Lumber Storage Warehouse, Inc., which name was later changed to Logan Lumber Company. Throughout the period from 1930 through 1960, W. W. Logan, Sr., and subsequently Logan Lumber Company engaged in the business of wholesaling and jobbing lumber and related materials. A wholesaler is one who sometimes operates from an office without a warehouse, a lumber yard, or an inventory; *216 a jobber or wholesale jobber operates a wholesale warehouse, a wholesale yard, or both. Both sell to retailers, agencies of government, shipyards and other purchasers in quantity. In addition to the sales made out of its warehouses and lumber yard in Tampa, petitioner also made sales in carload lots which went direct from petitioner's supplier to the purchaser. It sold only to purchasers entitled to buy lumber at wholesale prices and did not sell on a retail basis. In about 1935 petitioner opened a wholesale warehouse in Miami, Florida, which was later expanded to include a wholesale yard. The Miami branch continued operations until 1958. From 1950 to 1958 its annual sales represented about 30 percent of the total sales of petitioner. During World War II petitioner was awarded contracts for lumber and related materials by numerous United States Government installations, including the Key West Naval Air Station, Charleston Navy Yard, Norfolk Navy Yard, and Pensacola Naval Air Station. In Tampa materials were supplied on a regular basis during this period to MacDill Air Force Base, Drew Field, Tampa Shipbuilding Company and Tampa Marine Co. Because of his contacts in the lumber industry *217 and his experience during World War I, W. W. Logan, Sr., was able to find and supply many scarce items to various Government agencies during World War II. Immediately after World War II there was an enormous demand for lumber of all kinds for building purposes. Petitioner's problem was one of supply since it could sell all the lumber it could acquire. In order to improve its sources of supply, W. W. Logan, Sr., accompanied by his wife, made a trip to the Pacific Coast in the early part of 1946. They spent 250 days there visiting every sawmill town from Everett, Washington, to Middle California, and doing a great deal of entertaining of large and small groups of lumber suppliers. W. W. Logan, Sr., accompanied by his wife, made numerous visits to the Pacific Coast in subsequent years. They spent 100 to 150 days there in 1947; 100 to 125 days in 1948, and 75 to 100 days in 1949. While he was away from Tampa his son, W. W. Logan, Jr., operated the business. Realizing that cypress lumber was becoming scarce, W. W. Logan, Sr., sought a durable wood to replace it. In 1948 and 1949 he was responsible for petitioner being the first lumber company to introduce and sell redwood lumber in *218 Florida. As a result of his visits to mills in California, he became an expert in the handling of redwood. After a pioneering period redwood lumber was readily accepted by the Florida market. When the Korean War started in 1950, there was an increase in the demand for lumber, and in 1950 and 1951 W. W. Logan, Sr., accompanied by his wife, made trips to the Pacific Coast to procure certain items which were in short supply, and to renew his acquaintance with shippers. During 1951, 1952, and earlier years, W. W. Logan, Sr., accompanied by his wife, attended some United States Government auctions held in Atlanta, Georgia, St. Louis, Missouri, Columbus, Ohio, and Portland, Oregon. His purpose in attending these auctions was to submit bids on supplying the lumber needs of various Government agencies. In order to bid, a company was required to have a representative present. Petitioner realized some profit from business received as a result of bidding at such auctions. Petitioner maintains membership in various trade associations, including the National Plywood Distributors Association, the National American Wholesale Lumber Association, the National Hardwood Lumber Association and *219 the National Wholesale Distributing Yard Association, the Southern Sash and Door Jobbers Association, Philippine Mahogany Association and Florida Lumber and Mill Works Association. W. W. Logan, Sr., was president of the National Plywood Distributors Association in 1950-1951 and served as a director in other years. He was also a director of the National American Wholesale Lumber Association. His duties with these associations required him to attend as many as eight meetings a year. During the years 1951 and 1952 W. W. Logan, Sr., visited petitioner's Miami Branch frequently, sometimes as often as once a week. The travel vouchers of W. W. Logan, Sr., show that the number of days he was away from Tampa during each of the following fiscal years was as follows: 1951
113 days
1952
124 days
1953
100 days
1954
65 days
1955
133 days
1956
266 days
1957
183 days
1958
342 days
1959
111 days
1960
95 days
During the years 1951 and 1952, when W. W. Logan, Sr., was away from the office for any reason, W. W. Logan, Jr., was in charge of the operations of petitioner. W. W. Logan, Sr., was 63 and 64 years of age during the fiscal years 1951 and 1952. In July *220 1952 he had a cancerous kidney removed and was in the hospital for two months and at home under a nurse's care for about two additional months. While in Tampa prior to his illness he worked long hours during the weekdays and picked up the mail twice on Sundays. If it contained a special offering in which he was interested, he would send a wire so that it would be on the shipper's desk on Monday morning. He worked "specially hard" during the period 1944 to July 1952 and there was no significant change in his contribution to the company as far as his personal efforts were concerned in any of the years in that period. His principal duties as president of petitioner during this period involved the supervision of all financial matters, helping W. W. Logan, Jr., in the purchase of materials, and looking after some other matters affecting the business of petitioner. After his operation W. W. Logan, Sr., returned to "very limited" duty in November 1952. His health has not been "up to par" since his operation and he has not returned to a "full work day". He and his wife took vacation trips to Hawaii in 1952 and 1955. In 1956 they took a trip to Hawaii, Philippines, Hong Kong, Japan, Australia *221 and New Zealand. Since 1956 they have taken vacation trips to Hawaii two or three times. In 1958 they went to Miami, where W. W. Logan, Sr., supervised the liquidation of the Miami branch of petitioner which was closed during that year. In the Spring of 1952 petitioner employed a firm of consulting industrial psychologists to study its operations and make recommendations with respect to its organization and personnel. As a result of the study, a recommended organization chart was drawn up and job descriptions prepared for the positions of president, manager of merchandising division (sales manager), and manager of warehouse and shipping. The consultants recommended that W. W. Logan, Sr., become Chairman of the Board and reduce his activities, and that W. W. Logan, Jr., be elected president. On August 2, 1952, while W. W. Logan, Sr., was in the hospital, petitioner's board of directors elected him Chairman of the Board and elected W. W. Logan, Jr., president. Reasonable compensation for services rendered to petitioner by W. W. Logan, Sr., during the years ending June 30, 1951 and June 30, 1952, is $50,000 per annum. W. W. Logan, Jr., was born in Meridian, Mississippi, in 1914 *222 and moved to Tampa in 1929. He completed his high school course in two and a half years, was a member of the National Honor Society, and graduated from college in 1936. His first job with petitioner at the age of 18 was as a bundle tier and he became a full time employer in 1936. He was elected an officer in petitioner in 1940 or 1941. During the fiscal years 1951 and 1952, W. W. Logan, Jr., was vice president of petitioner. He also held the positions of merchandising (sales) manager and credit manager; was in charge of labor and personnel relations, and the hiring and supervising of salesmen; and purchased 90 percent of all equipment used by petitioner. W. W. Logan, Sr., consulted with him on matters of company policy but not in financial and accounting matters. During the absence of W. W. Logan, Sr., from Tampa, W. W. Logan, Jr., managed petitioner's affairs, and kept in touch with his father by long distance telephone. During the fiscal years 1951 and 1952, W. W. Logan, Jr., worked about 53 hours a week at his office and from 1 to 3 nights each week at home. He kept dictating equipment and a typewriter at his home to do company work in the evenings. After becoming petitioner's *223 president on August 2, 1952, W. W. Logan, Jr., continued to serve also as merchandising sales manager until September 1956 when Ross Hayes, petitioner's "top" salesman, became merchandising manager. Hays received an annual salary of slightly in excess of $18,000 for his services as merchandising manager. After becoming president, W. W. Logan, Jr., worked 57 to 60 hours a week. He arrived at work at 7:30 a.m., ahead of the other employees, and generally left at 6:00 p.m. He customarily worked six days a week and picked up the mail on Sunday. He interviewed and hired key personnel, supervised the Miami branch and visited it frequently, handled all imports and customer matters, checked incoming materials from new suppliers, approved invoices for payment, reviewed time put in by employees and signed paychecks, toured the warehouses and yards at least once a day, conferred daily with members of the management group, purchased all hardwoods, doors, imported items, and a good portion of the plywood, conferred with salesmen, received and analyzed salesmen's reports until Ross Hayes became sales manager, approved all credit memoranda, supervised work of the credit manager, and attended sales *224 meetings on Saturday mornings. In addition to his salary from petitioner, W. W. Logan, Jr., received from $2,400 to $5,000 in annual salary from Rome Avenue Corporation, hereinafter described. His duties in behalf of Rome Avenue Corporation were performed on an occasional half-day, but also extended to two or three weeks when new buildings were under construction in 1951 and 1955. He never worked for Rome Avenue Corporation to the exclusion of petitioner. The amounts paid by petitioner as compensation to W. W. Logan, Jr., during the years ending June 30, 1951 through June 30, 1960, represent reasonable compensation for services rendered by him to petitioner during those years. Donald A. Logan, the second son of W. W. Logan, Sr., and Mattie R. Logan, began working for petitioner on a part time basis when he was 15 to 16 years old. When he finished high school and college he was employed full time. From July 1, 1950 until December 31, 1957, he was secretary of petitioner. He was also a director, and served as manager of warehousing and shipping. He had a good knowledge of woods. He left the petitioner's employ in December 1957. The amounts allowed by respondent as deductions *225 for compensation for services rendered to petitioner by Ronald A. Logan during the years ending June 30, 1951 to June 30, 1957, inclusive, represent reasonable compensation for his services. Mattie R. Logan and W. W. Logan, Sr., were married in 1912. Her family had a background in the lumber and sawmill business. During the years 1946 to July 1952, she accompanied her husband on any trips made by him to the Pacific Coast to procure lumber materials in short supply, to trade association meetings and conventions and other places, and helped him entertain suppliers and their wives. When they were at home in Tampa during those years, she went with him to the office of petitioner on Saturday afternoons and on Sundays after church and gave him some assistance. During those years she also gave him some assistance when he worked at home at night on petitioner's business. She was able to operate a typewriter with two fingers. After her husband's extended illness beginning July 1952 and his partial resumption of activities in behalf of petitioner she continued to perform some services for petitioner until 1956 when her health began to fail. A reasonable allowance for compensation for such *226 services rendered by her during the fiscal years 1953-1956, inclusive, would be $1,800 a year. She performed no compensable services in the fiscal year 1957 and thereafter. During the summer of 1951, petitioner's income tax returns for the fiscal years 1944 through 1950 were audited by the Internal Revenue Service. In December 1952, petitioner received a letter advising that criminal prosecution for attempted tax evasion had been recommended against it and W. W. Logan, Sr., for the years 1944 through 1950. The letter also contained schedules asserting income and excess profits tax deficiencies and penalties against petitioner for those years. No civil or criminal fraud charges were ever asserted against W. W. Logan, Jr., or Donald A. Logan, nor were any deficiencies determined against them for the years 1944 through 1950. In 1953 petitioner and W. W. Logan, Sr., were indicted for attempted tax evasion. On April 16, 1958, both defendants pleaded nolo contendere. W. W. Logan, Sr., was fined $10,000 and petitioner $5,000. Newspaper publicity in 1953 concerning the indictment of petitioner and W. W. Logan, Sr., caused petitioner to lose some customers. It also caused anxiety among *227 petitioner's suppliers. On or about July 15, 1959, petitioner reecived a statutory notice of deficiency dated July 10, 1959, which asserted deficiencies and penalties for the years 1944 through 1950 totaling $433,284. (Logan Lumber Company v. Commissioner, Tax Court Docket No. 83519.) Accrued interest on the asserted deficiencies as of that date amounted to $171,505. The total liability asserted against petitioner on July 15, 1959, including accrued interest, was $604,789. Petitioner's book net worth on June 30, 1959, was $482,920. Pursuant to agreement of the parties decision was subsequently entered in that case providing for total deficiencies and additions to tax in the aggregate amount of $88,146.98, exclusive of interest thereon. Rent Issue W. W. Logan, Sr., had originally conducted his lumber business as a sole proprietor on certain property on Rome Avenue, Tampa, which he leased. As the lumber business expanded, additional leases were obtained on contiguous or nearby property. Still later, W. W. Logan, Sr., purchased all of the property thus used in the lumber business. On May 22, 1945 he and his wife executed a deed conveying that property to Rome Avenue Corporation, *228 which had been organized as a Florida corporation in 1945. From July 1, 1950 to June 30, 1960, the stock of Rome Avenue Corporation was owned in the following proportions: July 1, 1950
Dec. 17, 1954
to
to
Dec. 16, 1954
June 30, 1960
W. W. Logan, Sr.
85%
55%
Mattle R. Logan
5%
5%
W. W. Logan, Jr.
5%
20%
Donald A. Logan
5%
20%
On May 22, 1945, petitioner and Rome Avenue Corporation entered into a lease agreement pertaining to the property on which the lumber business was conducted wherein petitioner agreed to pay a rental of $600 per month for a period of five years commencing June 1, 1945. On November 13, 1951, they entered into a lease agreement wherein petitioner agreed to pay a rental of $2,700 per month ($32,400 per annum) for a period of five years. On July 1, 1956, they entered into another lease agreement wherein petitioner agreed to pay a rental of $34,200 per year for a term of 25 years commencing on July 1, 1956. Petitioner made payments to Rome Avenue Corporation, which it deducted as rent for the premises it occupied in Tampa, Florida, in its income tax returns for the fiscal years during June 30, 1951 to June 30, 1960, in *229 the following amounts: 1951
$24,300
1952
26,700
1953
34,200 [2]
1954
34,200 [2]
1955
34,200 [2]
1956
34,200 [2]
1957
34,200
1958
34,200
1959
34,200
1960
34,200
In the statutory notice of deficiency for the fiscal years ending June 30, 1951 to June 30, 1960, respondent allowed petitioner deductions for rent on the property it occupied in Tampa, Florida, in the following amounts: 1951
$15,000
1952
15,000
1953
21,000
1954
21,000
1955
21,000
1956
21,000
1957
21,000
1958
21,000
1959
21,000
1960
21,000
The property rented by petitioner was on a private railroad siding, owned by the lessor, which ran for two blocks fronting the property on one side of the street and one block in front of the property on the other side of the street. The property was about two blocks north of the main arterial street in Tampa going east and west, and about two miles from "downtown". The property occupied by petitioner was a special purpose property and the use made by petitioner *230 of it was its highest and best use. Prior to 1951 it comprised five sheet-metal warehouses, six lumber sheds, a frame office building and a large lumber storage yard. In 1951 a sixth warehouse was constructed on the property at a cost of $42,110.67, and petitioner began to use it in the latter part of December of that year. This warehouse, known as the "forklift building" has steel and wood supports and a metal roof. It is 28 to 30 feet in the clear which allows lumber to be staked that high through the use of fork lift trucks. The floor is asphalt or asphalt and concrete. It has a big overhang and wife expanse. It is a very efficient building is use. The square feet in land and improvements on the premises rented by petitioner from Rome Avenue Corporation consisted of the following: (a) office space
1,303 sq. ft.
(b) warehouses
24,382 sq. ft.
(c) fork lift shed
main body
8,705 sq. ft.
overhang
8,295 sq. ft.
mouldings building
4,646 sq. ft.
(d) lumber sheds
12,955 sq. ft.
(e) land not under buildings
118,295 sq. ft.
(f) carports and small storage
room
unspecified
The Tampa properties rented by petitioner from the Rome Avenue Corporation had a fair *231 market value, in use as a lumber yard, of $140,000 on December 31, 1953. If petitioner had dealt at arm's length with a stranger it would have been required to pay as rent for the Tampa properties the following amounts: Fiscal year ended
June 30
Rent
1951
$19,150
1952
22,500
1953
26,820
1954
26,820
1955
26,820
1956
26,820
1957
26,820
1958
26,820
1959
26,820
1960
26,820
Inventory Issue - 1952 In its income tax return for the year ending June 30, 1952, petitioner, in computing the cost of goods sold during that year, reported its inventory at the end of the year to be $588,298.69. Respondent determined that petitioner had understated its closing inventory in the amount of $58,830 and that its ending inventory was therefore $647,128.69. In years prior to the fiscal year ending June 30, 1952, the inventory of petitioner was priced on the basis of lower of cost or market. The average cost of freight-in to petitioner was 10 percent of the cost of the commodity. Petitioner had a physical inventory taken at the end of each of its fiscal years, and, in addition, it maintained a perpetual inventory. Petitioner's physical inventory as of June 30, 1952, was *232 taken under the direction and supervision of W. W. Logan, Jr. He computed the unit prices of the items included in the inventory and gave them to the inventory personnel charged with putting the unit price on each item and extending the totals into dollars and cents. The year ending June 30, 1952, was an unstable year in the lumber industry due to the collapse of the Korean War boom; there were wide fluctuations in the cost of materials. Because of these fluctuations, W. W. Logan, Jr., instructed the inventory personnel to use as the cost of certain items, the price of which had fluctuated during the year, the f.o.b. mill cost of those items as of June 30, 1952, less a wholesale discount of five percent and a two percent cash discount. There were some items which did not fluctuate in price during the year; these items were priced in the inventory at delivered invoice cost to petitioner. One of these items was masonite; W. W. Logan, Jr.'s instructions to the inventory personnel with respect to that item were to take the list price then in effect, and deduct 10 percent. The deduction of 10 percent was made because petitioner, as a wholesale jobber, was entitled to an eight percent *233 "functional" discount and a two percent cash discount on the list price of masonite. Delinquent return - 1952 Petitioner's income tax return for the year ending June 30, 1952, was due to be filed on September 15, 1952. On or about September 13, 1952, W. W. Logan, Jr., as president, signed a "Tentative Return" for petitioner for the year ending June 30, 1952. This return was received by the district director on September 17, 1952. It contained only one entry "Tentative Loss $75,000.00." On January 15, 1953, W. W. Logan, Jr., as president of petitioner, signed its income tax return for the year ending June 30, 1952. This return was received by the district director on January 16, 1953. This return and the "Tentative Return" dated September 13, 1952, were prepared by Jim Quinn, petitioner's certified public accountant. W. W. Logan, Sr., as president of petitioner, signed all of its income tax returns filed prior to July 1952; however, the signature of W. W. Logan, Jr., also appears on petitioner's "Tentative Return" for 1951, and the signature of D. A. Logan appears on petitioner's returns for both 1951 and 1952 in the place calling for the signature of the treasurer, assistant *234 treasurer, or chief accounting officer. Petitioner's failure to timely file its income tax return for the taxable year ending June 30, 1952, was not due to reasonable cause. Opinion RAUM, Judge: 1. Reasonableness of salaries. For each of the fiscal years 1951 through 1960 the Commissioner determined that a specified amount of the compensation paid to some or all petitioner's officers was "excessive", and he fixed a "reasonable allowance" for the salary of each such officer for each taxable year in controversy with respect to such officer. Section 162(a)(1) of the 1954 Code provides that there may be deducted as an ordinary and necessary expense "a reasonable allowance for salaries or other compensation for personal services actually rendered". Comparable provisions are found in Section 23(a)(1)(A) of the 1939 Code. The Commissioner's determination reduced the allowable deduction in the case of W. W. Logan, Sr., for the years 1951 and 1952, in the case of W. W. Logan, Jr., for all the years 1951-1960, in the case of Donald A. Logan for the years 1951-1957, and in the case of Mattie R. Logan for the years 1953-1960. Petitioner agrees on brief that the Commissioner's action was *235 correct in respect of Donald A. Logan's salary, but contests the remaining adjustments. The question is one of fact, and the burden of proof is upon petitioner. We hold, upon the entire record, that the Commissioner's action must be sustained as to the salary of W. W. Logan, Sr., disapproved as to the salary of W. W. Logan, Jr., and sustained in part as to the salary of Mattie R. Logan. Petitioner is a close family corporation. Its stock is all owned by members of the Logan family, four of whom as officers received substantial amounts as salaries during the taxable years. In these circumstances special scrutiny must be given to such salaries, because of the lack of arm's length bargaining, to determine whether they represented reasonable allowances for services actually rendered or were to some extent a distribution of profits or accumulated earnings in the guise of salaries. All facts and circumstances surrounding the payments must be taken into consideration in making this determination. Petitioner had a large accumulation of earned surplus and undivided profits during the years ending June 30, 1951 through June 30, 1960. It paid substantial amounts to its officers as salaries *236 during those years even though in six out of the ten years it had net losses after the deduction of those salaries. It has never paid a cash dividend during the 28 years of its existence. Much of the evidence introduced by petitioner relates to the services rendered to petitioner by W. W. Logan, Sr., and W. W. Logan, Jr. It convinces us that both of these officers worked long hours, were well qualified by training and experience to perform the duties of the offices held by them, and capably performed those duties. Nevertheless, we are satisfied on the evidence before us that the Commissioner did not err in reducing the allowable deduction for the salary of W. W. Logan, Sr., from $72,000 to $50,000 for the years 1951 and 1952. Both parties presented evidence bearing upon the reasonableness of the salaries involved, but there were certain inherent weaknesses in the evidence offered by each of them. It would serve no useful purpose to discuss that evidence. We have studied it carefully, and have reached the factual conclusion that the salary of W. W. Logan, Sr., was reasonable to the extent of $50,000 for 1951 and 1952, and was excessive to the extent that it exceeded that amount. We *237 therefore approve the Commissioner's determination in this respect. On the other hand, we must disapprove the Commissioner's determination as to W. W. Logan, Jr. During the fiscal years 1951 and 1952, he was second in command, and actually managed the business during the extended periods that his father was away from Tampa, 113 days in 1951 and 124 days in 1952. In August 1952, after his father underwent a serious operation, W. W. Logan, Jr., became president of the company and from that point forward was in charge of petitioner's affairs. W. W. Logan, Sr., was in the hospital for two months, under nurse's care at his home for two more months, and never thereafter regained his full health. He did return gradually to work, but W. W. Logan, Jr., was in charge of the enterprise. W. W. Logan, Sr., was "Chairman of the Board", largely, we think, a euphemistic title in the circumstances disclosed herein. He undoubtedly did render valuable services, both as a consultant and otherwise, but his efforts were radically different from what they had been previously, and the record discloses that he took a number of extended vacations in Hawaii and elsewhere. Perhaps the Commissioner would have *238 been justified in revising his salary downward for the years after 1952, but no such issue is before us. The important thing here is that W. W. Logan, Jr., became president and rendered services of a character that had theretofore been performed by his father. We think that the salary paid to him was reasonable and that the Commissioner erred in respect of disallowing deductions for the payments made to him. The record in respect of the services of Mattie R. Logan is unsatisfactory. There was much evidence as to the nature of her services during the period following World War II when lumber was in short supply and when she assisted her husband in trips to the West Coast seeking new sources of supply. Also, the record discloses services performed by her on Saturdays and Sundays in Tampa prior to August 1952. But the years before us that involve her salary and services are 1953-1960, and the evidence as to her services in those years is murky and unsatisfactory. Petitioner's effort to establish that her services beginning in the year 1953 were substantially the same as those in prior years was unconvincing. Her prior services were largely in the nature of assistance to her husband. *239 But beginning with the fiscal year 1953 his services were drastically curtailed, and we do not have any confidence in general testimony to the effect that her prior efforts continued as before. Nevertheless, we think that she did continue to render some valuable services up to a point when her health began to fail in 1956, and doing the best we can with the materials at hand we have found that a reasonable allowance for such services would be $1,800 for each of the year 1953-1956, inclusive, but that she rendered no compensable services thereafter. 2. Rent. The Commissioner disallowed a portion of the deductions claimed by petitioner for each of the tax years in respect of alleged rent paid to Rome Avenue Corporation, controlled by the Logans, for occupancy of the premises in Tampa used in its business. Petitioner does not now defend the deduction of the full amounts claimed on its returns, but relies upon testimony of its expert witnesses to support deductions which are less than those originally claimed for most of the years but substantially in excess of the amounts allowed by the Commissioner. Petitioner relies upon expert testimony based upon a hypothetical percentage lease *240 formula and alternatively upon rental value computed on a square foot basis by one of its experts. It also makes a third argument in respect of this issue based upon the nature of the Commissioner's determination. It states in its reply brief that the acceptance of any one of petitioner's three alternative arguments "will dispose of the rent issue". We think there is no merit in petitioner's first and third contentions, but since we are in substantial agreement with it in respect of the second argument we will not enter into any discussion of the other two. Section 23(a)(1)(A) of the 1939 Code and Section 162(a)(3) of the 1954 Code provide that there shall be allowed as a deduction all of the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property * * *." In applying these provisions in Roland P. Place, 17 T.C. 199, affirmed 199 F. 2d 373 (C.A. 6), certiorari denied 344 U.S. 927, this Court (at p. 203) said: The basic question *241 is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. The inquiry is whether the petitioner was in fact and at law "required" to pay these sums as rent. * * * When there is a close relationship between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. * * * Cf. J. J. Kirk, Inc., 34 T.C. 130, affirmed 289 F. 2d 935 (C.A. 6). Unlike the deductions for salaries, which require a determination as to the "reasonableness" of the amounts in question, the issue here is whether the amounts were in fact paid for use of the leased premises. But where the amounts paid in a transaction not entered into at arm's length are in excess of rent that would have been required by a stranger the Court is entitled to conclude that the excess was not in fact paid "as a condition to the continued use or possession" of *242 the property. We heard testimony from one of petitioner's expert witnesses as to the rentals that the property in question would command in the Tampa area upon a square foot basis. The property consisted of various buildings as well as unenclosed areas. He assigned different square foot rental values to the various portions involved in accord with the nature of the particular portion. We were convinced by his testimony. He arrived at a rounded figure of $26,820 a year for the entire property. We have based our findings upon that figure and have concluded that petitioner would have been required to pay $26,820 a year as rent to a stranger for the property in question during the fiscal years 1953-1960. However, we revised that figure downward for the fiscal years 1951 and 1952 to reflect the absence of the fork lift building until about the beginning of the second half of the fiscal year 1952. We hold that the amounts which we have thus found are deductible by petitioner as rent in respect of the property. 3. Inventory. The Commissioner determined that petitioner's closing inventory for its fiscal year ending June 30, 1952 was understated in the amount of $58,830. Petitioner had *243 the burden of proving error in this determination. Section 22(c) of the Internal Revenue Code of 1939 provides that "Whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner * * * may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income". Section 29.22(c)-2 of Regulations 111 provides, inter alia, that "In order to clearly reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation so long as the method or basis used is substantially in accord with these regulations", and that the "bases of valuation most commonly used by business concerns and which meet the requirements of section 22(c) are (a) cost and (b) cost or market, whichever is lower." Section 29.22(c)-3(2) of these regulations provides that cost means - In the case of merchandise purchased since the beginning of the taxable *244 year, the invoice price less trade or other discounts, except strictly cash discounts approximating a fair interest rate, which may be deducted or not at the option of the taxpayer, provided a consistent course is followed. To this net invoice price should be added transportation or other necessary charges incurred in acquiring possession of the goods. The evidence produced by petitioner on this issue consists of testimony by W. W. Logan, Jr., as to the method he used in pricing the closing inventory of petitioner for its fiscal year ending June 30, 1952. It appears from his testimony that since there was a wide fluctuation in the cost of lumber purchased during that year, he used the f.o.b. mill cost on June 30, 1952, less certain wholesale and cash discounts, as the cost of all materials inventoried with the exception of certain items, such as masonite, the price of which did not fluctuate during the year. As we understand his testimony, which was not too clear, he stated in conclusory fashion that he "did take freight into account", but that he used the f.o.b. mill cost at the end of the year, rather than invoice cost plus freight-in, [3] because in his judgment, if he did not *245 add the cost of freight-in, the f.o.b. mill cost at the end of the year would "very closely coincide with what I considered to be my cost". However, we do not know what he meant by "very closely", and no supporting evidence was offered to show that the inventory figures used actually reflected true cost (which in fact fluctuated widely during the year) plus freight-in. Nor was any evidence of any kind presented other than the unsatisfactory conclusory testimony of W. W. Logan, Jr., which did not carry conviction in respect of this matter. In years prior to the tax year ending June 30, 1952, petitioner consistently priced its inventory on the basis of lower of cost or market. There is no evidence indicating that in those years the amounts used by petitioner as cost were estimated by making adjustments to the f.o.b. mill cost of inventory items as of the close of the fiscal year. Indeed, the record indicates otherwise. We *246 cannot find that the method used by W. W. Logan, Jr., in pricing its inventory as of June 30, 1952 was consistent with the method used in prior years. Neither can we find, after a careful consideration of all of the evidence, that that method did not result in an understatement of petitioner's closing inventory. In the circumstances, the respondent's determination must be, and is, sustained. 4. Delinquent return for 1952. The remaining question is whether petitioner's failure to file a timely income tax return for the year ending June 30, 1952 was due to reasonable cause, within the meaning of Section 291(a) of the Internal Revenue Code of 1939. [4]
*247 Prior to the time W. W. Logan, Jr., became president of petitioner on August 2, 1952, its returns were signed by W. W. Logan, Sr., as president of petitioner. As required by law, they also contained the signature of another officer, in 1951 that of D. A. Logan. Petitioner's return for the year ending June 30, 1952 was due on September 15, 1952. On September 13, 1952, W. W. Logan, Jr., as president and D. A. Logan as treasurer signed a "Tentative Return" for petitioner which was filed on September 17, 1952. This return was not an effective compliance with the statute. Chesterfield Textile Corporation, 29 T.C. 651, 665-666. Petitioner's actual return for the year ending June 30, 1952, signed on January 15, 1953 by W. W. Logan, Jr., as president, and D. A. Logan as "Secy-Treas.", was not filed until January 16, 1953. W. W. Logan, Jr., testified that he delivered corporate records to the accountant who prepared petitioner's income tax returns in ample time to file the 1952 return before the deadline; that the first time he learned that the return had not been filed on time was when the 90-day letter was received from the Commissioner some ten years later; and that, even *248 though he signed the return as president, he was not conscious at that time that September 15 was the deadline for filing inasmuch as he had never prior thereto filed a return for petitioner. The evidence discloses that petitioner used a certified public accountant to prepare its returns, but that there is no convincing evidence that it relied upon him to file its returns or that he was responsible for the late filing. The responsibility for filing the 1952 return was upon petitioner's officers, including not only W. W. Logan, Jr., its newly elected president, but also D. A. Logan, its treasurer, [5] who did not appear as a witness. Moreover, W. W. Logan, Jr., had become petitioner's president on August 2, 1952, more than a month before the 1952 return was due. The fact that he signed the "Tentative Return" on September 13 is certainly some indication that he was aware that the return was due on September 15 and, in view of the fact that he signed the 1952 return itself on January 15, 1953, it is difficult to believe that he learned only 10 years later that it had not been filed on time. And even if it be assumed that he was not in fact aware of the deadline, such ignorance would *249 not constitute reasonable cause for late filing. See Frank Souza, 33 T.C. 817, 826. It is true, as petitioner points out on brief, that his election as president in August 1952 placed new responsibilities upon him and that the 1952 return was the first return he had signed as president. This does not, however, establish reasonable cause for filing a late return. Furthermore, the record is completely silent about the possible negligence of D. A. Logan in respect of the late filing. Unlike the statutory addition to tax for fraud, where the burden of proof is upon the Government, the burden of proof here is upon petitioner. We hold that petitioner has not carried its burden in this case. Accordingly, we have found as a fact that petitioner's failure to file a timely income tax return for 1952 was not due to reasonable cause. Decision will be entered under Rule 50. Footnotes
1. See following page for footnote.↩
1. These figures appear in proposed findings of fact submitted by petitioner to which respondent offered no objection; however, they do not appear either in "Schedule E. - Compensation of Officers" in the 1953 and 1954 returns in evidence or in the adjustments made to officers' salaries for those years in the Notice of Deficiency.↩
*. Petitioner's conversion of $200,000.00 from surplus to capital by means of a stock dividend has been disregarded in the above table.↩
2. This figure, which appears in the deficiency notices for 1953-1956, is inconsistent with the annual rental of $32,400 specified in the applicable lease.↩
3. Expenditures for "freight-in" are part of cost of goods and must be added to inventory valuation. D. Loveman & Son Export Corp., 34 T.C. 776, 804-805, affirmed 296 F. 2d 732 (C.A. 6), certiorari denied, 369 U.S. 860↩.
4. SEC. 291. FAILURE TO FILE RETURN. (a) In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. * * *↩
5. Section 52 of the 1939 Code requires that corporate returns be sworn to by two officers, namely by "the president, vice president, or other principal officer and by the treasurer, assistant treasurer, or chief accounting officer".↩