Melvin H. Goodman and Roselyn A. Goodman v. Commissioner. Frances P. Goodman v. Commissioner.
Goodman v. Commissioner
Docket Nos. 5616-68, 5617-68.
United States Tax Court
T.C. Memo 1971-226; 1971 Tax Ct. Memo LEXIS 107; 30 T.C.M. (CCH) 970; T.C.M. (RIA) 71226; September 7, 1971, filed. Francis J. Riordan, 163 Court St., Portsmouth, N. H., for the petitioners. David L. Miller, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioners' income tax as follows: Melvin H. & Roselyn A. Goodman
1965
$4,656.14
Frances P. Goodman
1964
$ 245.18
1965
1,311.52
After several concessions by the petitioners, the only year which remains in issue is 1965. The sole question for decision is whether reductions in the value of the closing inventory of the family partnership business to amounts below cost properly reflected the *108 lower of "cost or market" value of the inventory on December 31, 1965, pursuant to section 471, I.R.C. 1954, and the regulations thereunder. Findings of Fact The parties have filed a stipulation of facts, which together with accompanying exhibits, is incorporated herein by this reference. Petitioners Melvin H. and Roselyn A. Goodman are husband and wife. They filed a joint Federal income tax return for the calendar year 1965 with the district director of internal revenue, Portsmouth, New Hampshire. Petitioner Frances P. Goodman, the mother of Melvin H. Goodman, filed a separate individual Federal income tax return for the calendar year 1965 also with the district director of internal revenue, Portsmouth, New Hampshire. At the time the petitions herein were filed, Melvin H. and Roselyn A. Goodman, as well as Frances P. Goodman, resided in Portsmouth, New Hampshire. During 1965 Melvin H. Goodman ("Melvin") and Frances P. Goodman were partners engaged in a retail clothing business in Portsmouth under the name of "Goodman's." Melvin had entered into the clothing business with his father in 1930. Melvin's brother, Robert D. Goodman ("Robert"), has been a *109 salaried employee of "Goodman's" since 1940, first on a part-time basis (1940-1945) and thereafter full-time (since 1945). Neither Melvin nor Robert had any formal education beyond the high school level. "Goodman's" did not employ an accountant or bookkeeper in its office. Instead, the bookkeeping was handled by Melvin and Robert. They maintained "Goodman's" books and records on an accrual basis of accounting. They also took an inventory of "Goodman's" stock at the end of each year, and computed a value for such closing inventory on a "cost or market" basis using the same general method employed by "Goodman's" since 1930. According to this method the items in the closing inventory (which also served as the opening inventory for the following period) were initially valued at retail prices when the inventory was taken. This valuation of the inventory was then reduced by 50 percent. Since "Goodman's" took a "mark-up" on all items of approximately 100 percent based on cost, the 50 percent reduction of the inventory valued at retail prices, in effect, brought the valuation of the inventory approximately down to cost. The valuations for the various classifications of the inventory were *110 then further reduced by a particular percentage for each classification determined by Melvin and Robert. They would make a visual inspection of all the merchandise on display in the various departments and the merchandise stored in the stockroom, and would determine a particular percentage by which they thought the valuation of each classification of the inventory should be further reduced to reflect the market value of the items therein 971 as a whole. In determining this additional percentage reduction Melvin and Robert considered several factors relating to the inventory: age, size range, soilage and style. A small portion of the inventory was affected by soilage, but this factor did not affect that part of the inventory stored in the stockroom. When making the determinations of the additional percentage reduction Melvin and Robert did not consider the inventory item by item, but rather their impression of the overall stock in the various departments. The percentage thus determined was then applied to all the items making up that classification. These percentages did not remain constant from year to year, but were determined annually upon the basis of a general visual inspection *111 of each class of merchandise. Using this method "Goodman's" closing inventory for 1965 (as of December 31) was determined as follows: MEN'S DEPARTMENT
Additional
Percentage
Closing
Class of Merchandise
50% of Retail
Reduction
Inventory
Shirts
$ 9,441.15
12
$ 8,308.21
Neckwear
728.42
12
641.02
Hosiery
1,359.92
10
1,223.94
Hats
1,302.92
12
1,146.58
Gloves
416.97
15
354.43
Underwear
3,608.17
13
3,139.12
Pajamas
515.27
12
453.45
Robes
715.17
15
607.90
Belts and Wallets
824.42
12
725.50
Garters and Braces
15.87
10
14.29
Handkerchiefs
387.97
10
349.18
Jewelry
423.05
10
380.74
Shoes, Slippers and Rubbers
2,280.72
13
1,984.24
Suits
19,736.07
13
17,170.39
Sport Coats
6,675.65
14
5,741.02
Topcoats and Raincoats
3,669.17
13
3,192.19
Trousers
12,054.32
13
10,487.27
Miscellaneous
1,258.26
12
1,107.28
Sweaters
5,484.12
12
4,826.03
Sportswear
7,155.47
15 6,082.16
TOTAL $67,934.94
LADIES' DEPARTMENT
Additional
Percentage
Closing
Class of Merchandise
50% of Retail
Reduction
Inventory
Blouses
$2,961.88
13
$ 2,576.84
Sweaters
2,558.75
13
2,226.11
Gloves
221.77
12
195.17
Nite Wear
5.95
10
5.89
Robes
119.80
15
101.93
Slippers
41.70
10
37.53
Bermudas
526.72
30
368.71
Dresses
2,010.45
14
1,728.99
Suits
7,233.55
12
6,365.52
Jackets
440.47
11
392.03
Coats and Raincoats
3,157.30
14
2,715.28
Skirts
2,879.62
12
2,534.07
Slacks
1,400.38
13
1,218.33
Hats
174.70
25
131.02
Handbags
84.75
25
63.56
TOTAL $20,660.98
*112 972
BOY'S DEPARTMENT
Additional
Percentage
Closing
Class of Merchandise
50% of Retail
Reduction
Inventory
Shirts
$ 967.97
14
$ 832.46
Neckwear
14.00
10
12.60
Hosiery
154.24
11
137.28
Hats and Caps
44.85
50
22.43
Sweaters and Jackets
1,316.90
11
1,172.04
Gloves
57.50
10
51.75
Underwear
566.80
13
493.12
Pajamas
94.60
15
80.41
Belts
36.50
10
32.85
Sneakers
170.02
20
136.02
Sportswear
2,055.77
15
1,747.41
Suits
547.37
15
465.27
Sports Coats
498.35
17
413.63
Raincoats
182.12
12
160.27
Slacks
2,601.36
15
2,211.16
Miscellaneous
3.00
10
2.70
TOTAL $7,971.40 "Goodman's" total closing inventory for 1965 valued at 50 percent of retail prices - or, in other words, approximately at cost -, amounted to $111,182.22. After the various "Additional Percentage [Reductions]" were applied to these valuations of the different classifications of the inventory, the value of the total closing inventory for 1965 was $96,567.32, or $14,614.90 below the approximate cost of the inventory. Through its inventory was thus valued purportedly at "market" values which were below cost, "Goodman's" offered *113 its inventory for sale at normal retail prices from January 1, 1966, until the last week in January, 1966; and, during this period at least part of the inventory was sold at these retail prices. As it did each year, during the last week in January, 1966, and until February 22, 1966, "Goodman's" conducted three consecutive clearance sales of its entire remaining 1965 closing inventory. "Goodman's" did not purchase any new merchandise for these sales, and did not offer for sale any items other than those comprising its 1965 closing inventory. In the last week in January, 1966, "Goodman's" conducted a sale to which its charge account customers were specifically invited. At this so-called "private sale" the prices of all the items in the inventory were reduced to approximately cost. Around the first week in February, 1966, "Goodman's" "private sale" was then followed by a "public sale" of which the public was informed by general advertisement. At the "public sale" the items in "Goodman's" inventory were offered also at approximately cost, except that the prices of items comprising a small portion of the inventory were reduced even further when lots became broken during the "private *114 sale" and the full range of sizes of those items could no longer be offered. The "public sale" continued up until February 22, 1966. During the period of the "private" and "public" sales about 60 percent of the inventory was sold at approximately cost. On February 22, 1966, "Goodman's" conducted its Washington's Birthday sale, which was intended to be a "final clean-up" of the items in the 1965 closing inventory. At this sale the remaining inventory was offered at prices reduced below cost, but the record does not adequately establish the extent to which the prices were reduced below cost or what the prices, thus reduced, were. Approximately an additional 20 percent of the inventory on hand at December 31, 1965, was sold during the February 22 sale at prices reduced below cost. During these three clearance sales the merchandise in "Goodman's" stockroom was put on display in the various departments as particular items were sold. Approximately 85 or 90 percent of the merchandise in the stockroom was moved to the front of the store in this manner during the "private" and "public" sales. After these clearance sales the remaining portion of the inventory was offered once again at *115 retail prices until another clearance sale in August, 1966. A small portion of the items remaining was sold during this period between the February 22 clearance 973 sale and the sale in August. Practically all of the remaining items were then sold at the August sale but the record does not disclose the prices at which they were sold. "Goodman's" conducted its clearance sales (the three sales in January and February, and the August sale) each year, and sold virtually its entire closing inventory from the preceding year in this manner. In this respect, substantially all of the items in its closing inventory in any given year were no more than one year old. "Goodman's" books and records included "inventory sheets" on which its inventory was recorded at retail prices, and a "purchase book" wherein the cost of all merchandise purchased was entered. However, the record does not disclose whether "Goodman's" maintained any books and records relating to the numbers of the various items comprising the different classifications of its closing inventory, or the actual reductions below cost of these specific items in the valuation of the inventory, or the particular prices for which these *116 items were ultimately sold. No books and records relating to "Goodman's" 1965 closing inventory were introduced into evidence. An informational, partnership return of income for 1965 was filed for "Goodman's" by Melvin H. Goodman. The return reflected that "Goodman's" gross receipts (less returns and allowances) for 1965 were $296,877.11, that the cost of goods sold was $203,364.98, and that gross profits thus amounted to $93,512.13. Schedule A of the return, in which the "Cost of Goods Sold" was to be determined from the value of "Goodman's" closing inventory among other figures, was left blank. The return also disclosed that Melvin's share of the partnership income for 1965 was $22,626.34 and that Frances P. Goodman's share was $7,542. On their tax return for 1965 Melvin and Roselyn A. Goodman reported Melvin's $22,626.34 share, and on her 1965 return Frances P. Goodman reported her $7,542 share. In his deficiency notices to the petitioners the Commissioner determined that "Goodman's" closing "inventory at 12/31/65 is understated in the amount of $14,615.25." Accordingly, he determined that the net income of the partnership should be increased by this amount, which, in turn, *117 increased the respective partnership shares of Melvin H. Goodman and Frances P. Goodman. Opinion RAUM, Judge: "Goodman's", a partnership owned by petitioners Melvin H. Goodman and Frances P. Goodman, his mother, valued its 1965 closing inventory on the basis of the lower of cost or market. The "cost" and "market" valuations of its inventory were determined by a method used by "Goodman's" with general consistency since 1930. Under this method, all the items comprising the inventory were initially valued at retail prices. These valuations were then reduced by 50 percent to what was approximately the cost of the inventory. Since the Commissioner does not challenge that this valuation of the inventory at 50 percent of retail prices, in fact, approximates cost, and since he has made no determination related thereto, we regard this valuation as being a cost valuation of the inventory for the purposes of this case. To arrive at what was regarded a "market" value for the inventory, the cost valuation of each classification of the inventory was then further reduced by a particular percentage determined by petitioner Melvin H. Goodman and his brother, Robert, upon the basis of a general *118 visual inspection of each class of merchandise. The percentages were redetermined annually, and did not remain constant from year to year. Petitioners argue that the valuation of "Goodman's" inventory at below cost was justified because the value of the merchandise had been affected by soilage, by changes in styles and by the breaking of lots. They also emphasize the series of sales subsequent to the inventory date at which the merchandise was offered for sale at reduced prices. The Commissioner, on the other hand, contends that the valuation of "Goodman's" 1965 closing inventory at an amount below cost by use of the additional percentage reductions did not comply with the provisions of sections 1.471-2(c) or 1.471-4, Income Tax Regs. We agree with the Commissioner that the 1965 closing inventory was understated by use of the additional percentage reductions. The burden of proof is upon the petitioners to show the Commissioner's determination is erroneous. Photo-Sonics, Inc., 42 T.C. 926, 931, 933, affirmed 357 F. 2d 656 (C.A. 9); cf. section 1.471-2(c), Income Tax Regs. *119 The petitioners have introduced no books or records which verify the valuation of "Goodman's inventory by use of the additional percentage reductions. Generally, the use of arbitrary percentage reductions below 974 cost has not been regarded as an acceptable method of determining the market value of an inventory. Kleeman Dry Goods Co., 2 B.T.A. 369, 371; Alexander Reid & Co., 2 B.T.A. 425; Orents Department Stores, Inc., 3 B.T.A. 52; Perkins Sash & Door Co., 5 B.T.A. 847, 849-850; cf. O.A. Steiner Tire Co., 9 B.T.A. 1289, 1291-1292. [1] Moreover, reductions below cost on entire classifications of the inventory do not meet the requirements of section 1.471-4(c), Income Tax Regs., that, where the lower of cost or market basis of valuation is used, "each article on hand at the inventory date shall be compared with the cost of the article * * *." More than mere conjectures or estimates is required to establish that the market value of merchandise included in inventory is, in fact, below cost. *120 R.J. Darnell, Inc., 18 B.T.A. 125, 139, affirmed 60 F. 2d 82 (C.A. 6).
We think that neither section 1.471-2(c), Income Tax Regs., nor section 1.471-4(b), Income Tax Regs., aids the petitioners' case. Section 1.471-2(c) provides that under certain circumstances pertaining to "exceptional goods" the valuation of the inventory should be based on "bona fide selling prices." [2]Section 1.471-4(b) generally allows for valuation of inventory according to sales prices which are lower than cost where the merchandise is offered for sale within a reasonable period after the inventory date. [3] There has been a complete failure of proof as to whether "Goodman's" method of inventory valuation qualifies under either section. Although we may assume that soilage, changes in style and the breaking of lots had some relation to a determination *121 of a "bona fide selling price" for any or all of the items on "Goodman's" inventory, [4] this is not enough to satisfy the requirements of section 1.471-2(c). The regulation states 975 that "bona fide selling price means actual offering of goods during a period ending not later than 30 days after inventory date." (Emphasis added.) Section 1.471-2(c), Income Tax Regs. "Goodman's" continued to offer its entire 1965 closing inventory (valued as of December 31) at retail prices for the first three weeks of January, 1966. During its "private sale" in the last week of January, "Goodman's" offered the then remaining inventory at cost. It was only during the "public sale" in the first week of February - more than 30 days after the inventory date - that the selling prices of certain items comprising a small portion of the inventory were reduced below cost because lots had become broken during the "private sale." Moreover, the record does not establish the "actual offering" prices at either the "private" or the "public" sale, or even at the later (February 22, 1966) Washington's Birthday sale. Also, it does appear on the record that about 60 percent of "Goodman's" *122 1965 closing inventory, which was valued at below cost, was actually sold at approximately cost during the "private" and "public" sales and at regular retail prices during the first three weeks of January. And though there was evidence that at the Washington's Birthday sale "Goodman's" entire inventory as of that time was priced below cost, we note that between that date and the August, 1966, sale the remaining inventory was offered again at normal retail prices. *123 For these same reasons we think petitioners have failed to carry their burden of proving that "Goodman's" offered its inventory for sale (1) at "prices * * * determined by reference to * * * actual sales," and (2) within a "reasonable period before and after the date of the inventory," within the meaning of section 1.471-4(b). The principal argument advanced by the petitioners is that "Goodman's" method of inventory valuation was consistently applied, and that such method should therefore be approved by the Commissioner pursuant to section 1.446-1 (c) (2) (ii), Income Tax Regs., even though it does not comply with recognized methods of inventory accounting. But section 1.446-1 (c)(2)(ii) requires that under any such unauthorized method of accounting "income * * * [must be] clearly reflected * * *." And it is by no means clear to us that the unauthorized method employed here would clearly reflect income. In the first place, it is not strictly accurate to say that the same method was followed consistently over the years. To be sure, "Goodman's" used the same general *124 method of applying percentage reductions against the purported cost of the different classes of merchandise. But the percentages themselves differed from year to year, and these percentages were fixed annually upon the basis of a subjective judgment which in turn was based upon a visual inspection of the various categories of merchandise rather than individual items. Nor do we have any satisfying assurance that the same standards were used from year to year in determining the percentages. Thus, by changing the percentages for the closing inventory in any particular year, it would be possible to distort income for that year, since the opening inventory for that year would have been computed on the basis of different percentages used for the closing inventory of the preceding year. We accordingly conclude that the Commissioner did not err in requiring adjustments to the closing inventory for 1965 so as to eliminate the arbitrary percentage reductions. But this does not end the matter, for, unless a corresponding adjustment were made in the opening inventory for that year, there would be a distortion of income that would operate to petitioners' disadvantage. However, we are faced with *125 an almost insuperable difficulty in making such corresponding adjustment in the opening inventory, because the record does not contain either the cost figures for the opening inventory or the percentages employed in making the reductions therefrom. Nevertheless, we are fully satisfied on the record that percentage reductions in some amounts were made in respect of the various classes of merchandise comprising the opening inventory, and we think it appropriate to fix some amount that will give effect to this circumstance. Conceivably, the elimination of the reduction in the opening inventory could neutralize entirely the error in the closing inventory; or, if the reductions in the opening inventory were smaller than in the closing inventory, their elimination would only partially neutralize the error. There is a gap in the record in this respect, and petitioners are not entitled to profit thereby. The situation is one calling for the exercise of our best judgment in the light of the meager materials before us. Accordingly, "bearing heavily," cf. Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2), upon petitioners, who are responsible for the unsatisfactory condition of *126 the record, we have reached the conclusion and hereby find as a fact that a corresponding adjustment in the amount of $7,500 is 976 required in the opening inventory for 1965. The Commissioner's determination in respect of the inventory item is therefore approved only to the extent that it exceeds $7,500. Decisions will be entered under Rule 50. Footnotes
1. See also Gem Jewelry Co., Inc., a Memorandum Opinion of this Court dated January 13, 1947, affirmed 165 F. 2d 991 (C.A. 5), certiorari denied, 334 U.S. 846↩.
2. Sec. 1.471-2 Valuation of Inventories. * * * (c) The bases of valuation most commonly used by business concerns and which meet the requirements of section 471↩ are (1) cost and (2) cost or market, whichever is lower. * * * Any goods in an inventory which are unsalable at normal prices or unusable in the normal way because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes, including second-hand goods taken in exchange, should be valued at bona fide selling prices less direct cost of disposition, whether subparagraph (1) or (2) of this paragraph is used, or if such goods consist of raw materials or partly finished goods held for use or consumption, they shall be valued upon a reasonable basis, taking into consideration the usability and the condition of the goods, but in no case shall such value be less than the scrap value. Bona fide selling price means actual offering of goods during a period ending not later than 30 days after inventory date. The burden of proof will rest upon the taxpayer to show that such exceptional goods as are valued upon such selling basis come within the classifications indicated above, and he shall maintain such records of the disposition of the goods as will enable a verification of the inventory to be made. 3. Sec. 1.471-4 Inventories at cost or market, whichever is lower. * * * (b) * * * Where the taxpayer in the regular course of business has offered for sale such merchandise at prices lower than the current price as above defined, the inventory may be valued at such prices less direct cost of disposition, and the correctness of such prices will be determined by reference to the actual sales of the taxpayer for a reasonable period before and after the date of the inventory. * * * ↩
4. Aside from testimony that "Goodman's" was a "style business," there was no specific evidence indicating that any of the classifications of the inventory had become dated because of changes in style. Indeed, we regard as incredible the testimony given that all the merchandise, including such things as underwear, became unsalable at normal prices or at least at cost for reasons of style. Moreover, the items in the closing inventory were no more than one year old at the time of valuation. There was also testimony that particular lots of merchandise had become broken and that it was therefore not possible to offer a complete range of sizes. But there was no specific evidence relating to the identification of these broken lots as of the inventory valuation date, or the portion of the inventory which consisted of merchandise which was unsalable at normal prices for this reason. Certainly, we are far from satisfied that such merchandise was unsalable at least at cost, which was 50 percent below normal retail prices. We have found that a small portion of "Goodman's" inventory was in fact affected by soilage. However, the regulations clearly set out the procedure by which "Goodman's" could have valued its 1965 closing inventory with respect to any diminution in value due to soilage. Section 1.471-2(c), Income Tax Regs. Where there is no replacement market, to which to refer in determining a market value for items in inventory below cost, reference must be had to "bona fide selling price * * * during a period ending not later than 30 days after inventory date." D. Loveman & Son Export Corporation, 34 T.C. 776, 799, affirmed 296 F. 2d 732 (C.A. 6); John L. Ashe, Inc. v. Commissioner, 214 F. 2d 13, 15-16 (C.A. 5), affirming in part and reversing in part a Memorandum Opinion of this Court. Therefore, we think that "Goodman's" failure to meet the requirements of section 1.471-2(c) is also fatal to any adjustment to its inventory valuation in respect of soilage. John L. Ashe, Inc. v. commissioner, supra, 214 F. 2d at 15-16↩.