MORRIE CHAITLEN, TRANSFEREE OF THE STATE METALS & STEEL COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent THE STATE METALS & STEEL COMPANY, INC., a dissolved Ohio corporation, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chaitlen v. Commissioner
Docket No. 5816-75.
United States Tax Court
T.C. Memo 1978-6; 1978 Tax Ct. Memo LEXIS 504; 37 T.C.M. (CCH) 17; T.C.M. (RIA) 780006; January 9, 1978, Filed; As Amended January 26, 1978 *504 Petitioner, The State Metals & Steel Company, Inc. valued its closing inventory for October 31, 1970, at $100,000. Held, proper inventory value determined to be $150,000. Charles W. Davis,Douglas L. Barnes,Peter B. Freeman, and Francis O. McDermott, for the petitioners. Harmon B. Dow and Gary C. Gough, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined a deficiency of $47,361 in the income tax of The State Metals & Steel Company, Inc. (hereinafter State Metals), for its taxable year ended October 31, 1970, and further determined that Morrie Chaitlen was liable under section 6901 [1] as a transferee of the corporation for the same amount. The sole issue before us is whether State Metals properly valued its closing inventory for the taxable year ended October 31, 1970, at $100,000. FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. State Metals, an Ohio corporation, maintained its principal office and place of business in Canton, Ohio, when it filed its 1969 income tax return for the taxable year ended October 31, 1970. State *505 Metals was in the business of purchasing, processing, and selling scrap metal. It purchased a wide variety of scrap metals from various sources. Purchases were ordinarily transported to the yard by truck at which time the scrap was weighed. The metal was stored in piles, segregated into different grades, and then processed by cutting, stripping, or burning. The processed metals were ultimately sold to steel mills, refineries, foundries, and others for further processing or fabrication. State Metals, an accrual basis taxpayer, determined its cost of goods sold through the use of inventories. Although its tax returns reflected that the inventory was valued at lower of cost or market and under the assumption that the inventory was comprised of the most recently purchased goods (FIFO), it actually valued inventory under a method peculiar to the scrap metals industry. Under this method, a corporate officer would visit the scrap yard, estimate quantities of the various categories of scrap, and determine a price for the scrap after referring to market quotes in trade journals, market conditions, and the processing stage of the inventory. State Metals did not maintain a perpetual inventory *506 to assist in inventory valuation and compiled no other records reflecting its inventory method. Prior to March 2, 1970, State Metals was owned and operated by Joseph and Maurice Kline and related parties. Although Maurice Kline was deceased at the time of trial, the testimony of Earleen Brady, a State Metals' bookkeeper for 25 years, established that he visually estimated the quantities of various types of scrap metals on hand and determined a value for the tax return by reference to his knowledge of specific market conditions, published industry-wide market quotations, including those found in American Metal Market and Iron Age, and purchase and sales invoices. Maurice Kline, who had over 30 years' experience in the scrap metal business, valued the closing inventory of State Metals for its year ended October 31, 1969, at $510,675. On March 2, 1970, petitioner Morrie Chaitlen, his son-in-law, Larry Lasky, and others purchased all of the State Metals' stock from the Kline group. At the time of the stock purchase, State Metals' inventory was scattered and unmanageable, and it was the new owners' intention to reduce the inventory and thereby create a more efficient operation. State *507 Metals continued to operate from March 2, 1970, until July 31, 1970, when a labor strike terminated all business activities. On or about June 1, 1970, the union representing State Metals' employees served State Metals with a 60-day notice of termination and a new contract proposal containing its demand. From mid-June through July, State Metals, anticipating the expiration of the union contract, reduced its inventory. State Metals conducted no further business activity between July 31, 1970, the date of the strike, and March 5, 1971, the date the business was resold by Chaitlen and his associates. As a result, State Metals' inventory as of March 5, 1971, was the same as its closing inventory on October 31, 1970, and its inventory on July 31, 1970, when the strike was called. In September 1970, Lasky, vice president and secretary of State Metals, accompanied Chaitlen, president of State Metals, on an inspection of the scrap yard for the purpose of placing a value on its closing inventory for the taxable year ended October 31, 1970. Chaitlen had discussed methods of valuing the inventory with his accountant, Joel Chemers. Chaitlen prepared notes, which were unavailable at trial, *508 as they visually estimated the quantities of the various types of scrap metals on hand. After discussing specific market conditions, Chaitlen estimated the value of the inventory based upon the discussion and prices quoted in American Metal Market and Iron Age. In an attempt to estimate replacement cost, Chaitlen used a lower figure than the exact selling price quoted in the trade journals to reflect processing and handling costs for the entire inventory. Chaitlen then told Merrill Eisenstein, a State Metals' accountant, that the value of the closing inventory on October 31, 1970, was $100,000. Eisenstein accepted the figure without requiring any supporting data and entered it on the tax return for the period ending October 31, 1970. Eisenstein testified that it is an acceptable accounting practice to accept a client's valuation of inventory for tax purposes when no audit is performed. It takes several years of experience to accurately estimate the value of a pile of unprepared scrap metal. Although Chaitlen had no experience in the scrap metal business prior to the acquisition of State Metals, Lasky had about ten years' experience in dealing with nonferrous scrap metals. In November *509 1970, Chaitlen commenced negotiations for the sale of State Metals' assets to the Luntz Corporation. Luntz Corporation was engaged in the same type of business as State Metals and maintained an adjoining scrap yard. Robert Luntz and Simon Grubman, president and vice president of Luntz Corporation, respectively, inspected State Metals' property, including its inventory. They were assisted by Richard Kosack, a warehouse superintendent of Luntz Corporation who was experienced in ferrous metals. Grubman, a State Metals' employee from 1948 to 1966, had considerable experience in estimating the quantity and value of nonferrous scrap metal. Luntz, Grubman, and Kosack inspected State Metals' inventory and visually estimated the quantities of the various scrap metals. Based upon this inspection, Luntz Corporation offered Chaitlen $200,000 for the operating assets of State Metals, allocating $150,000 to the inventory and $50,000 to the equipment. Grubman testified that the $150,000 price would allow the Luntz Corporation to load, transport, handle and process the inventory, yet still make a profit upon its resale. This approximates replacement cost. Chaitlen initially requested $400,000 *510 for the business, but after negotiations the parties arrived at a sales price of $300,000, $200,000 of which was allocated to inventory and $100,000 to equipment. Grubman testified that he was unhappy with the $200,000 offer, but since the inventory could not be purchased for $150,000 he advised Luntz Corporation that the higher offer was acceptable although it would allow less profit. Chaitlen did not participate in the allocation of the $300,000 sales price between inventory and equipment, but he was represented by counsel during the negotiations. On March 5, 1971, State Metals sold all of its operating assets to Luntz Corporation under an agreement reflecting these terms. Pursuant to a plan of complete liquidation adopted on September 16, 1970, State Metals reported the inventory and equipment sale for its year ended October 31, 1970, as qualifying under section 337. The corporation was dissolved on September 15, 1971, after liquidating distributions to Chaitlen who had become the sole shareholder. The parties agree that if the Court determines a deficiency is due from State Metals, petitioner Chaitlen will be liable for the deficiency under section 6901 as the transferee *511 of State Metals. OPINION The sole issue for our consideration is to determine the value of State Metals' closing inventory on October 31, 1970. State Metals contends that the actual cost of its inventory could not be determined. [2] *512 As such, it argues it is permissible to value the inventory at the cost of its replacement under the lower of cost or market method. State Metals points out that Chaitlen and Lasky determined, in a manner consistent with prior years, the replacement cost of the October 31, 1970, inventory to be $100,000. Respondent argues that State Metals kept no books or records to allow him to properly investigate and determine the correctness of its inventory valuation. As a result, respondent, relying on section 1.471-4(b), Income Tax Regs., valued the inventory at $200,000, a value assigned to the inventory by Luntz Corporation prior to purchasing State Metals' assets. State Metals argues that respondent's reliance on the sales price of the inventory is misplaced since cost of replacement is the appropriate standard. We cannot entirely agree with either party. The role of inventories in the process of computing gross income is confined to determining the cost of goods sold which is found by subtracting the closing inventory from the sum of opening inventory and purchases. [3] *513 See Frank G. Wikstrom & Sons, Inc. v. Commissioner,20 T.C. 359, 361 (1953). Section 471 requires that inventory practices conform to the best accounting practice in the trade or business and that they clearly reflect income. The regulations recognize two of the most common methods of valuing inventory: (1) cost and (2) the lower of cost or market. Sec. 1.471-2(c), Income Tax Regs. In order to clearly reflect income, however, more emphasis is placed upon consistency of inventory practice than to the particular method chosen. Sec. 1.471-2(b), Income Tax Regs.
In the case of purchased goods, cost means invoice price less trade discounts plus transportation. Sec. 1.471-3(b), Income Tax Regs. If the taxpayer elects lower of cost or market, market means, in the case of purchased goods, the price which the taxpayer would have to pay to replace inventory items on the applicable inventory dates. Sec. 1.471-4(a), Income Tax Regs.; D. Loveman & Son Export Corp. v. Commissioner,34 T.C. 776, 796 (1960), affd. 296 F. 2d 732 (6th Cir. 1961), cert. denied 369 U.S. 860 (1962). Thus, market relates *514 to the taxpayer's replacement market and not its resale market. D. Loveman & Son Export Corp. v. Commissioner,supra.Moreover, each inventory item is valued at both cost and market, and the lower of the two is used as the inventory value of that item. Sec. 1.471-4(c), Income Tax Regs.
If the inventory consists of goods which have been so intermingled that they cannot be identified with specific invoices, it is presumed that the inventory, for tax purposes, consists of the goods most recently purchased; goods purchased first are presumed sold first (FIFO). Sec. 1.471-2(d), Income Tax Regs.
Regardless of the inventory method adopted, the taxpayer must maintain books and records which reflect its inventory practice and which allow the Commissioner to determine the correctness of its usage. Sec. 1.471-2(e), Income Tax Regs. When an examination of these records is made, the Commissioner's determination is accorded wide latitude and should not be disregarded unless the taxpayer shows that there has been a clear abuse of discretion by the Commissioner or that his determination was arbitrary. Photo-Sonics, Inc. v. Commissioner,42 T.C. 926, 931 (1964), affd. 357 F. 2d 656 (9th Cir. 1966). *515 Section 471 prescribes that inventories may be determined using a method which conforms to the best accounting practice in the trade or business and which most clearly reflects income. The regulations in this area are flexible in recognizing industry custom and accord great weight to consistency which hopefully leads to a clear reflection of income. Sec. 1.471-2(b), Income Tax Regs. Thus, we must decide whether petitioners have established that the State Metals inventory valuation method was acceptable in the industry and, if so, whether State Metals properly applied it. [4] *516 We are satisfied that the inventory valuation procedures used by Chaitlen and Lasky were acceptable in the scrap metal industry and were consistently applied by State Metals. Chaitlen and Lasky both testified that they followed the procedure of estimating inventory quantities and that Chaitlen thereafter attempted to estimate market value at replacement cost. Chaitlen testified in pricing the inventory, he relied upon market conditions, trade journals, market quotations, and other factors including the cost of processing *517 his inventory.
This method of valuation was the same approach followed by other scrap metal dealers including Maurice Kline, State Metals' former owner. The State Metals' bookkeeper, Mrs. Brady, testified that Kline would physically inspect the inventory and make estimates as to quantities of the various categories of metal. Thereafter, he referred to trade journals containing market quote information and his purchase and sales invoices to establish the value of the estimated inventory. As stated in D. Loveman & Son Export Corp. v. Commissioner,34 T.C. 776, 796 (1960), affd. 296 F. 2d 732 (6th Cir. 1961), cert. denied 369 U.S. 860 (1962), the appropriate market value of inventory is its replacement market. This method of valuation was also recognized by accountants who dealt with scrap metal companies. An accountant for State Metals prior to its acquisition by the Chaitlen group in 1970, indicated that his firm prepared State Metals' tax returns for many years. It was the practice of either Maurice or Joseph Kline, two of the former owners, to furnish him with a list and value of inventory items. The accountant would enter the total value of the inventory from this list on the *518 return. Merrill Eisenstein, the accountant who prepared State Metals' tax return for the year ended October 31, 1970, testified that Chaitlen told him the value of the ending inventory for October 31, 1970, was $100,000 and he accordingly entered that figure on the tax return. He testified that it is an acceptable accounting practice to accept a client's own inventory valuation for tax purposes where no audit is performed. Indeed, Joel Chemers, an accountant who represented Chaitlen in other businesses, testified that he discussed various inventory valuation methods with Chaitlen and found him knowledgeable about inventories and found him using and understanding the methods previously employed by Kline. Respondent argues that Chaitlen's and Lasky's testimony is totally uncorroborated by any books or records and as such there is no evidence they followed the inventory procedures testified to. We agree we are not bound to accept the testimony of an interested witness, especially where he has failed to keep adequate records reflecting his testimony. See Burka v. Commissioner,179 F. 2d 483, 485 (4th Cir. 1950); sec. 1.471-2(e), Income Tax Regs. Nonetheless, we are not required to *519 reject such testimony merely because of its character. If the testimony comes from witnesses who are impressive, if it is reasonable, if it is not inconsistent with other evidence, and if it is corroborated by other evidence, it is valuable. [5] We found the testimony of both Chaitlen and Lasky reasonable and convincing. The testimony of the accountant Chemers that he discussed the inventory procedures with Chaitlen corroborates their testimony. Chemers' testimony was direct, candid, and forthright. We believe that Chaitlen was properly informed as to the procedures he should follow to value the State Metals' inventory. Apparently, respondent too was convinced by Chemers' testimony. His failure to cross-examine Chemers leads us to conclude his testimony was accurate. [6]
Under these circumstances, we find that Chaitlen was justified in valuing the October 31, 1970, inventory by following the same type of procedures that Maurice Kline had followed in valuing previous inventories. We are not convinced, however, that Chaitlen *520 or his son-in-law, Lasky, was able to satisfactorily execute these procedures. Simon Grubman, a vice president of Luntz Corporation with considerable scrap metal experience, testified that it takes several years of experience to be able to accurately estimate the quantity of metal in a pile of unprepared scrap. Moreover, the practice of quantity estimation is so specialized that experts develop expertise in separate areas, such as ferrous and nonferrous metals. Chaitlen had no experience in the scrap metal business prior to the acquisition of State Metals, and Lasky had only limited experience in dealing with nonferrous scrap metals. The inventory of State Metals consisted, however, of both ferrous and nonferrous scrap metal. Grubman and Kosack, both of Luntz Corporation and experts in valuing nonferrous and ferrous metals respectively, visited the State Metals scrap yard and valued its inventory. The inventory was unchanged at their visit from when Chaitlen and Lasky valued the inventory. At that inspection, Grubman and Kosack estimated the replacement cost of the inventory to be $150,000. They estimated this figure would allow Luntz Corporation to load, transport, handle, and process *521 the inventory and still make a profit. Luntz Corporation operates an adjoining scrap yard to State Metals. We believe they would not incur any additional significant costs over what State Metals would have incurred in processing the metals for sale. Chaitlen's testimony established that he discounted market sale prices quoted in trade journals to allow for costs of processing the inventory. Simon Grubman's testimony established that he and Kosack also valued the inventory at replacement cost which would allow Luntz Corporation to load, transport, handle, and process the inventory and still make a profit. We believe these two valuation techniques were similar. As such, we consider $150,000 to be the best evidence in the record of the inventory replacement cost on October 31, 1970, because this figure was offered by those with the most experience in valuing inventory. The figure does not represent a selling market quote, as petitioners would have us believe, because the inventory was sold for $200,000 and Luntz Corporation was not a retail purchaser of the State Metals inventory. Had the $150,000 figure been offered by a mill to which petitioner normally sold and had the inventory *522 been actually sold for $150,000, we would be more impressed with petitioners' argument. We believe the Luntz Corporation was attempting to value the inventory so it could step into the shoes of State Metals, process the scrap, and still make a profit. Respondent argues that we may not consider the $150,000 figure to establish the value of the inventory since it was only an unaccepted offer. He cites Crosby v. Dorward,94 N.E. 78, 80 (Ill. 1911), as his only authority for this proposition. We are convinced this case is inapposite and the $150,000 valuation of Grubman and Kosack is relevant, material and competent evidence of the replacement value of the inventory. Crosby rejected offers as competent evidence to establish fair market value. The fair market value or selling price of the inventory is a matter not before us. In this respect, respondent's reliance on section 1.471-4(b), Income Tax Regs., to argue that we should accept the $200,000 selling price as the value of the inventory is misplaced. That regulation applies only where no market exists for the inventory, a circumstance clearly not present in this case. Finally, we see no relationship between Grubman and Chaitlen *523 which would lead us to discredit Grubman's valuation. Accordingly, after a careful review of the entire record, we find the value of State Metals' closing inventory on October 31, 1970, to be $150,000. In so holding, we are not unmindful of the wide discretion accorded the respondent's determination. Nonetheless, we believe respondent has applied the wrong standard to measure the value of the inventory. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. We are not convinced on the record before us that it was impossible for State Metals to determine the cost of its inventory. Although testimony was presented that State Metals did not maintain perpetual inventory records, no evidence was presented that suggested State Metals could not have maintained such records. The fact that it chose not to do so does not create an impossibility. Testimony reflected that State Metals kept purchase and sales invoices along with weight receipts for both incoming scrap and outgoing processed metals. These appear to be the kinds of records which facilitate a perpetual inventory system. When such records are combined with the FIFO flow of goods assumption, we believe it possible to determine the cost of the State Metals inventory for tax purposes.
3. The tax impact of respondent's increase in ending inventory can be explained as follows: as ending inventory is increased, the cost of goods sold is decreased thereby increasing the corporation's gross income. See sec. 1.61-3(a), Income Tax Regs.↩ As a result, respondent's $100,000 increase in State Metals' ending inventory results in a corresponding $100,000 increase in its gross income.
4. Although the parties agreed that State Metals valued its inventory on the lower of cost or market method, we think another method was utilized. Under this method, a corporate officer would visit the scrap yard, estimate quantities of the various categories of scrap, and determine a price for the scrap after referring to market quotes in trade journals, specific market conditions, and the processing state of the inventory. This method of inventory valuation in no way parallels the section 1.471-4(c), Income Tax Regs., procedure for the lower of cost or market method. In the first instance, State Metals never determined the cost of its inventory even though we believe as explained in footnote 2, it could have. Second, its method does not satisfy the requirement of separately determining and comparing the cost and market value of each inventory item. Such a comparison is the foundation of the lower of cost or market method which allows the inventory value to be adjusted downward in periods of price decline. Since we find that State Metals did not value its inventory on the lower of cost or market method, but rather has always utilized a hybrid method, it is not necessary to consider whether State Metals has improperly changed its method of accounting under sec. 446(e).↩
5. Starr v. Commissioner,T.C. Memo. 1954-93, affd. 226 F.2d 721 (7th Cir. 1955), cert. denied 350 U.S. 993↩ (1956). 6. See Pearl v. Commissioner,T.C. Memo. 1977-262↩.